(117 App. Div. 698)

## ST. JOHN v. ANDREWS INSTITUTE FOR GIRLS et al.

(Supreme Court, Appellate Division, First Department. February 8, 1907.)

**1. DEATH—PROOF OF DEATH.**

Proof that a testator and his wife and a legatee perished in the destruction by fire of a house in which they lived, and that the legatee died within a few minutes after being rescued from the fire in an unconscious condition, and without regaining consciousness, was sufficient, in the absence of evidence that the legatee survived the testator, to establish that the legacy did not vest in the legatee, so that, unless otherwise disposed of under the will, the same passed to the next of kin of the testator.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Death, §§ 5–9.]

**2. SAME—PRESUMPTIONS.**

There is no presumption of survivorship between those perishing in a common disaster, based on sex and age, or on physical condition and strength, nor is there a presumption that death occurred to all at the same instant, though through necessity in the administration of the law the title to real property passes and personal property is distributed as if they all perished at the same instant, in the absence of proof of facts showing survivorship among them.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Death, §§ 5–9.]

**3. SAME—BURDEN OF PROOF.**

Where it was shown that a testator and his wife and a legatee met their death in the destruction by fire of a house which they occupied, it was incumbent on the representative of the legatee, to entitle him to the legacy, to prove that she survived the testator, uninfluenced by a presumption of death at the same time, or by a presumption on the subject of survivorship.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Death, §§ 5–9.]

**4. SAME—EVIDENCE—SUFFICIENCY.**

Evidence examined, and *held* to support a finding that a legatee losing her life in a disaster causing the death of the testator survived the testator so that the legacy vested in her.

**5. WILLS—RESTRICTIONS ON GIFTS TO BENEVOLENT ASSOCIATIONS—RIGHT TO ATTACK VALIDITY OF BEQUEST.**

Laws 1860, p. 607, c. 360, provides that no person having a wife shall by will give to any benevolent association more than one-half of his estate after the payment of his debts, and such gift shall be valid to the extent of one-half, and no more. A testator devising property to a charitable institution and his wife died in a common disaster. *Held* that, on the statute being construed to prohibit such gifts only when the testator leaves a wife surviving him, the burden was on the next of kin to establish the fact that the wife survived, for on it their right to participate in the estate depended.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 35–38.]

**6. SAME.**

A bequest in violation of Laws 1860, c. 360, providing that no person having a wife shall bequeath to any charitable society more than one-

half of his estate, is void, and may be taken advantage of by his heirs or next of kin.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 35, 36.]

**7. SAME—WHAT LAW GOVERNS—CONSTRUCTION—TIME OF TAKING EFFECT.**

A will takes effect on the death of the testator, and its validity and construction depend on the law in force at that time.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 2, 1005–1007.]

**8. SAME.**

Laws 1860, p. 607, c. 360, providing that no person "having a * * * wife * * * shall" by his will devise to any charitable institution more than one-half of his estate after the payment of his debts, refers to the family status of the testator at the time of his death, and not at the time of the making of his will, and the statute is confined to cases where a husband leaves a wife surviving; the word "having" being construed to mean "leaving."

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 35–38, 1005–1007.]

**9. CHARITIES—CAPACITY TO TAKE UNDER WILL.**

The law favors the upholding of charitable bequests, whether they are administered in the state or beyond it, and where they are to be administered beyond the limits of the state the right of the foreign charitable legatee to take will be determined by the courts of the state before directing the executors to turn over the fund, but under the law of the foreign jurisdiction, unaffected by the law of the state relating to accumulations and perpetuities.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Charities, § 2; vol. 49, Wills, § 2.]

**10. WILLS—VALIDITY—CAPACITY OF LEGATEE—CORPORATION TO BE CREATED.**

A testator gave the residue of his estate to his executors, in trust to collect the income and pay the same to his wife for life, and directed that after her death a part of the residue should go to a charitable corporation to be formed by his executors, and declared that, in the event of his wife predeceasing him, the bequest to the corporation to be created should take effect on his death. Held, that the testator intended that the corporation should take, though not formed before the death of the wife, and the corporation formed by his surviving executor after the death of the wife should receive the bequest, if the same was consistent with the rules of law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 22.]

**11. SAME.**

Where a will devising the residue of the estate of the testator to his executors, in trust to collect the income and pay the same to his wife for life, and on her death to a charitable corporation to be formed by his executors, is susceptible of the construction that the bequest was to vest in the corporation, if in esse on the death of the wife, but, if not then in esse, that it was to vest in it when formed by the executor who survived the wife, a present bequest is not presumed, and, if a construction that the bequest was to vest in the corporation when formed will render it valid, that construction must prevail.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 19, 22, 967.]

**12. SAME.**

Where a will devising the residue of the estate of the testator to his executors, in trust to collect the income and pay the same to his wife for life, and on her death to a charitable corporation to be formed by his executors, must be construed as indicating an intent on the part of the testator that the bequest was to vest on his own death if his wife predeceased him, and on her death if she survived him, though the corpora-

tion was not then formed, the gift to the corporation would be void, unless
sustainable under Laws 1893, c. 701, declaring that gifts to charitable
uses shall not be deemed invalid by reason of indefiniteness, etc., since
the corporation was not then in being, and therefore incapable of taking,
and its subsequent incorporation could not avail.

**13. PERPETUITIES—WHAT CONSTITUTE.**

A testator gave the residue of his estate to his executors, in trust to col-
lect the income and pay the same to his wife for life, and directed that
after her death a part of the residue should go to a charitable corpora-
tion to be formed by his executors. *Held*, that as the corporation was re-
quired to be formed within two lives in being, and as the law in case of
a bequest for a charitable use permits the suspension of ownership and
the power of alienation during the period necessary to form a corporation,
not exceeding two lives in being at the death of the testator, the devise
to the corporation was valid as an executory devise, without regard to
whether Laws 1893, p. 1748, c. 701, relating to the validity of gifts for
charitable uses, was applicable.

**14. WILLS—CAPACITY OF LEGATEE TO TAKE.**

A testator gave a part of the residue of his estate to a charitable cor-
poration to be formed under the laws of Ohio. A corporation was formed
in Ohio and recognized by that state as valid. The formation of the cor-
poration was authorized by Laws Ohio 1902, p. 61, or possibly by Bates'
Ann. St. Ohio, §§ 3235, 3236, 3238, etc. *Held*, that whether the act of
1902 was in conflict with Const. Ohio, art. 13, par. 1, prohibiting the pas-
sage of special acts conferring corporate powers, or whether the formation
of the corporation could be sustained under the other statutes, it was a
de facto corporation, acting under color of law, and entitled to the be-
quest.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 19, 22.]

**15. CONVERSION—REALTY INTO PERSONALTY.**

Where it is essential to the carrying out of the plan of a testator that
his realty should be converted into personalty, the realty will be deemed
converted into personalty as of the date of his death.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Conversion, §§
28-37.]

**16. SAME.**

A testator devised his residue to his executors in trust to collect the in-
come and pay the same to his wife for life. and directed that on her death
a part of the residue should go to a charitable corporation to be formed
by his executors, and declared that the executors should turn over to the
corporation a part thereof in cash to enable the corporation to purchase
a site and erect a building thereon, and that the other part should be used
for the maintenance of the institution. *Held* that, though the testator in
giving the residuary estate to the corporation used the word "devise" as
well as the word "bequeath," there was an equitable conversion of his
real estate. and his executors held the property in trust to form the cor-
poration and deliver to it the residue in cash.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Conversion, §§
28-43.]

**17. CHARITIES—GIFTS—ABSOLUTE GIFTS.**

A testamentary gift in trust for a charitable use is an absolute gift so
far as the testator is concerned in order to enable the beneficiary to take
the same.

**18. PERPETUITIES—ACCUMULATION OF INCOME.**

Where a bequest to a charitable corporation to be formed after the
death of the testator is valid, the corporation, in the absence of any di-
rection in the will to the contrary, will take the income accruing prior to
its formation as an increment of the principal, and such income is not

within the contemplation of the statute regulating perpetuities and accumulations of income.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Perpetuities, § 68.]

19. WILLS—CONSTRUCTION—RIGHT TO INCOME.

Real Property Law, Laws 1896, p. 568, c. 547, § 53, and Personal Property Law, Laws 1897, p. 508, c. 417, § 2, provide that where there is a suspension of the power of alienation or ownership in consequence of a valid limitation of an expectant estate, during the continuance of which the income is undisposed of, the income belongs to the person presumptively entitled to the next eventual estate. A testator devised the residue of his estate to his executors, in trust to collect the income and pay the same over to his wife for life, and directed that on her death a part of the residue should go to a charitable corporation to be formed by his executors, and declared that, in case the gift to the corporation should fail, the property should go to a beneficiary named. The will did not dispose of the income accruing prior to the formation of the corporation. *Held*, that the corporation was the party first taking the estate after the suspension within the statute, and entitled to the income.

Appeal from Special Term, New York County.

Action by Gamaliel C. St. John, executor and trustee of Wallace C. Andrews, deceased, against the Andrews Institute for Girls and others for the construction of the will of Wallace C. Andrews, deceased. From a judgment construing the will, defendants Norman C. Andrews and others separately appeal. Affirmed.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, and CLARKE, JJ.

Harold Nathan, for appellants Norman C. Andrews, Emma H. Andrews, and Volney Rogers.

Ferdinand Shack, for appellant Julia A. Bruce.

Frank W. Hackett and Edmund Wetmore, for appellant Smithsonian Institution.

James W. Hawes and William N. Cohen, for respondent.

Henry Wollman and Virgil P. Kline, for respondent the Andrews Institute for Girls.

Herbert H. Gibbs, for respondent G. C. St. John.

LAUGHLIN, J. This is an action by the executor of and trustee under the last will and testament of Wallace C. Andrews, deceased, for a construction of the will of their testator. The will was executed on the 12th day of November, 1891, and the testator died in the city of New York on the 7th day of April, 1899, leaving real property in the states of New York, New Jersey, and Virginia, and certain personal property. At the time he executed the will he had a wife living, and he designated her as an executrix of his will, but she perished with him in the destruction of her house, No. 2 East Sixty-Seventh street, New York, where they resided, by fire; and the trial court was unable to decide on the evidence whether she predeceased or survived him. The will was duly admitted to probate, as one competent to pass both real and personal property, by the surrogate of the county of New York on the 22d day of May, 1899. Letters testamentary were issued to the plaintiff as sole surviving executor on the 23d day of May, 1899, and he qualified and has ever since acted as executor and trustee under the will. The legatees, heirs, next of kin, and the Attorney General—the

latter in accordance with the requirements of chapter 701, p. 1748, Laws 1893—were made parties defendant.

· The testator left no child, grandchild, or parent him surviving. In the first clause of the will he provided for the payment of his debts, funeral expenses, and the cost of administration, and certain specific legacies, depending on the value of his estate, to two sisters; and in the second clause devised the rest, residue, and remainder of his estate to his executors, in trust to collect the rents and income and pay the same over to his wife for life. Upon her death he, by the third clause, devised $500,000, if the estate should exceed that sum, and, if not, all the residue, one-fourth to each of two sisters, an eighth to another sister, an eighth to a niece, an eighth to Gamaliel C. St. John, brother to his wife, whom he appointed his executor, and an eighth to the wife of St. John; and by the fifth clause, "upon the death" of his wife, he "devised and bequeathed to·the corporation hereinafter directed to be formed, all the excess and residue" of his estate over the sum of $500,000 thereinbefore devised, as already stated. He then, in the sixth clause, provided for the formation of a corporation under the laws of Ohio by his executors to take the bequest; and in the succeeding clause of the will provided that, in the event that his wife should predecease him, the bequest to the Ohio corporation to be created "shall take effect upon my death." The executors, in fulfillment of the directions of the testator contained in the will, procured the incorporation of the Andrews Institute for Girls under the laws of Ohio on the 13th day of May, 1902, and the corporation organized and accepted the gift on the 29th of the same month. The legacies to Mr. and Mrs. St. John have not been paid. The residuary estate has not been distributed. Its value is about $1,300,000, and it is more than one-half of his entire estate. The testator further provided in the will that, should the bequest to the corporation to be formed under the laws of Ohio "because of illegality fail, or become impossible of realization, I then devise and bequeath the sum intended for it to the Smithsonian Institution * * * to be devoted to the purposes for which it was established." Georgie Boyden St. John, the wife of Gamaliel C. St. John, was also in the fire, and, although rescued alive, died soon after in consequence thereof.

The appellants, who are heirs and next of kin, or represent heirs or next of kin of the testator, contend, in the first place, that Mrs. St. John did not survive the testator; that, therefore, the legacy to her never vested, and consequently her husband, as administrator, is not entitled thereto; and, further, that as to this part of his estate the testator died intestate. The trial court decided that she survived the testator, and that the legacy which vested in her goes to her administrator. The first question to be decided, therefore, is this important question of fact as to whether she survived the testator. Most of the evidence in the record was read from another record of evidence taken before a referee in the year 1902—nearly three years before this trial—on a hearing on an application of one of the next of kin to be made a party to the accounting in the Surrogate's Court, which was before this court on a former appeal. Matter of St. John, 104 App.

Div. 460, 93 N. Y. Supp. 836.  We then refrained from expressing any opinion on the merits of the questions now presented.

The undisputed evidence shows that the testator and his wife perished in the destruction of the house by fire in the early morning of the 7th day of April, 1899, and that Mrs. St. John died within a few minutes after being rescued from the fire in an unconscious condition, and without having regained consciousness.  Proof of these facts, in the absence of evidence that Mrs. St. John survived the testator, was sufficient to establish that the legacy never vested in her, and that, unless otherwise devised or bequeathed under the will, it went to the next of kin of the testator.  Newell v. Nichols et al., 12 Hun, 604, affirmed 75 N. Y. 78, 31 Am. Rep. 424.  Under the civil law there was a presumption of survivorship between those who perished in a common disaster, based upon sex and age, and in some jurisdictions there is such a presumption based upon physical condition and strength; but in England and in this and other states of the Union, where the common law prevails, no such presumption exists, nor is there a presumption that in such case death occurred to all at the same instant; and yet through necessity in the administration of the law the title to real property passes and personal property is distributed as if they all perished at the same instant of time, in the absence of proof of facts or circumstances tending to show survivorship among them.  Wing v. Augram, 8 H. & L. 183; Wing v. Underwood, 4 De Gex, M. & G. 633; Newell v. Nichols, supra; Young Women's Christian Home v. French, 187 U. S. 401, 23 Sup. Ct. 184, 47 L. Ed. 233; Coye et al. v. Leach, Adm'r, 8 Metc. (Mass.) 371, 41 Am. Dec. 518; Johnson v. Merithew, 80 Me. 111, 13 Atl. 132, 6 Am. St. Rep. 162; ·Will of Abram Ehle, Estate of James A. Ehle, 73 Wis. 445, 41 N. W. 627. When, therefore, evidence was adduced  showing that they all met death in the same conflagration, it was incumbent upon the administrator of Mrs. St. John, in order to entitle him to receive the legacy given to her under the will, to prove facts or circumstances tending to show that she survived the testator; and the burden of proof of establishing this fact, upon which his right to the legacy ·depended, was upon ·him. Newell v. Nichols, supra.  It is to be borne in mind, however, in considering the evidence offered for this purpose, that the fact that they died as a result of a common conflagration raised no presumption of death at the same time, which the evidence offered in behalf of the administrator of Mrs. St. John must overcome.  Proof of death in the common disaster left the case without any proof or presumption on the subject of survivorship, and the burden was on the administrator of Mrs. St. John, not to overcome any presumption, but to prove the fact of survivorship, the same as any other fact is required to be proved in the administration of the law.  Newell v. Nichols, supra; Will of Abram Ehle, Estate of James A. Ehle, supra.  In the Wisconsin case cited, where neither party was rescued from a fire or seen alive during the fire, a finding of survivorship was sustained based upon circumstantial evidence as to the course and violence of the conflagration.  The learned trial justice in the case at bar found that the evidence established the fact that Mrs. St. John survived the testa-

tor. In the decision of the court many facts are found relating to this question with greater detail and minuteness than was essential, and perhaps than was justified by the evidence. We need not determine whether they are all sustained by the evidence. It was not necessary to show that she survived the testator any given length of time. It is sufficient if the evidence fairly warrants the inference that she survived the testator, even though the period of survivorship may have been less than a second.

The residence of the testator, in which the fire occurred, was the first house on the southerly side of Sixty-Seventh street east of Fifth avenue. It was about 27 feet in width and 80 feet in depth, with a rear extension, in addition, which extended up to the level of the third floor. The main building contained four stories, and an attic above the basement. The principal entrance was at the front and east. The vestibule opened into a hall nine feet in width, which led to the main stairway situated at the easterly side, about midway between the front and rear of the building. The library was directly west of this stairway, and separated from it by a hall into which it opened at the foot of the stairway, and it also opened into the dining room in the rear. The front room referred to by the witnesses and used as the parlor—on the diagram it is the library—opened into the library and into the hall between the vestibule and stairway. The main stairway only led to the third floor. Directly above the main stairway was a rectangular open space 19 feet in length, north and south, and 9 feet in width, extending to the roof, where it was covered by a large skylight. On the fourth floor the open space above the main stairway was enclosed by the wall of the building on the east and by semifireproof partitions of scantling, lath, and mortar six inches in thickness, extending to the attic, with a window in the south and north end, each $3\frac{1}{2}$ feet wide and $5\frac{1}{2}$ feet high, to light the fourth floor from the skylight. The lower part of the house was originally of fireproof or semifireproof construction, but throughout the house to a considerable extent lincrusta walton, a highly combustible material, had been used in decorating and particularly on the partitions on the fourth floor, and the furnishings of the house were highly inflammable. The testator was 65 years of age, his wife 53, and Mrs. St. John 38, all in fairly good health. Some time before the fire occurred all of the occupants of the house had retired for the night. The testator slept in the middle room on the second floor, over the library. His wife slept in the rear room on the same floor. Mrs. St. John and her six year old son, Wallace, slept in the rear room on the third floor, and two other children of Mrs. St. John and two nurses occupied the middle and front rooms on that floor. Six female servants occupied separate rooms on the fourth floor. Of the 14 occupants of the house on that fatal night only two survived. Jennie Beirne, the laundress, who occupied a room toward the southwesterly and rear part of the house on the fourth floor, overlooking an extension connecting the house with the third house on Fifth avenue southerly from Sixty-Seventh street, which was owned by the testator, escaped by jumping from the window upon the extension, from which she was taken into the Fifth avenue

house; and Alice White, now Sheak, the cook, who occupied a room in the southeasterly corner of the house overlooking an extension of the next house to the east, owned by one Rothschild, escaped by leaping from the window of her room upon this extension. The origin of the fire is not satisfactorily shown. Flames were first observed in the parlor and coming out the parlor windows and the transom over the front door. The flames quickly shot up the stairway and broke through the skylight, and on the third and fourth floors, particularly, they spread out from the wellhole above the stairway. There was also a servants' stairway which ran from the basement, or first floor, as to which the evidence is conflicting, just south of the main stairway, and separated from it by a partition of plaster blocks, supposed to have some fire resistance, to the fourth floor. On the fourth floor a hallway extended around the head of the servants' stairway and the partitioned off wellhole above the main stairway, connecting with a bathroom and with the servants' rooms on that floor. From the fourth floor, at a point near the entrance to the room occupied by Jennie Beirne, and diagonally southwesterly across the hall, about 12 feet from the head of the servants' stairway, a stairway extended to the attic; and from a point not definitely shown, but probably near the head of the stairway in the attic, an iron ladder led to a scuttle hole in the roof, which was found bolted after the fire, indicating that it had not been used. Between the third and fourth floors the flames spread out and practically consumed the servants' stairway and the partitions above around the wellhole over the main stairway. The testimony of the maids who survived tends to show that the testator came up to the fourth floor, which could only be reached by the servants' stairway, from the second or third floor, and from a point in the hall on the fourth floor toward the front from Jennie Beirne's room alarmed the servants by calling out to them, "Come on, girls, the house is on fire!" This was the last heard from him and the last place he is known to have been alive, and there is evidence tending to show that his charred remains were found in that hallway near the head of the servants' stairway. Jennie Beirne testified that she had been asleep and was awakened, but did not know by what, and then heard a noise and "got up right away"; that she noticed no smoke or anything in her room, thinks she had not closed her door tightly, but had left it partly open; that on rising she opened the door to see what was the matter and heard the voice of a man say "Come on, girls, the house is on fire"; that the voice seemed to be in the hall toward the front from her; that it was dark and she could not see anything, and she heard some of the girls call out, "Where is Alice? Call Alice," and that the voices of the girls seemed also to come from the hall very near where she stood; that she saw no flames in the hall, but saw the reflection of flames seemingly toward the rear of the house, but she was not certain; that she stopped at her doorway about one minute without going into the hall, and then went back and threw open her window, and, after standing a moment to think what to do, jumped onto the extension of the Fifth avenue house and lost consciousness; that she saw no smoke in the hall and experienced no signs of suffocation and no difficulty in breathing, but says that the reason she did not go into the hall and

downstairs was that she "believed that the house was all on fire downstairs"; that she supposed the voice she first heard was that of the testator, but could not say positively. Alice White (now Sheak) testified that she left the door of her room wide open on retiring, and was awakened by hearing Eva Patterson, one of the maids, calling, "Alice! Alice! fire! fire!" and the voice seemed to come from her bedroom door; that she heard no other voice or person in the house after that; that she got out of bed, and the room was full of smoke, and she felt kind of suffocated, and put something in her mouth to prevent suffocation, and then tried to escape by the door, "but it was either full of smoke or flames, or reflections of flames," she did not know which; that she could get no further than her door "because it was all full of smoke and flames," and so she went straight back to her window, threw it up, and jumped upon the extension of the Rothschild house; that she thinks it was five minutes after she was called before she jumped, and that she lay on the extension two or three minutes perfectly conscious, until the smoke which was on her blew off, and then climbed into a window in the Rothschild house and met some people, one of whom was a policeman, coming up, and was assisted to a house across the street; that about five minutes after she arrived there Mrs. St. John's second boy, Wallace, was brought over, and in two or three minutes after that she was taken away by the surgeon of the Presbyterian Hospital in an ambulance. And with respect to her condition she testified:

"I was burnt. All my right arm and my ears and nose and hair was slightly burnt. My right arm was burnt all the way up and the left arm a little. My nightdress was scorched, the sleeve was burned, but the other side, the right side, was scorched."

She heard no other noise and felt kind of suffocated when she got out of bed, and thinks her arm was burned while standing at the window, but whether by flames from within or without she could not say, but the only place she saw flames was in the hall. The evidence shows that the entrance to Jennie Beirne's room was about 12 feet southwesterly from the head of the servants' stairway, and that of Alice White was 22 feet southerly from the head of said stairway. It is undisputed that the charred remains of the testator were found on the fourth floor, but there is some conflict in the evidence as to the precise spot. McManus, one of the firemen who found the body, testified on the former proceeding that it was found in the hallway "right near the stairway" leading down to the third floor, and the court has so found. This fireman, when called to the stand on this trial and shown a diagram, indicated thereon that the body was found in the hallway opposite the opening over the main stairway, and his testimony indicates that he supposed that the main stairway led to the fourth floor. Although the servants' stairway between the third and fourth floors was substantially burned away, sufficient remained to indicate where it had been, and part of it was standing, and was observed by one at least of the firemen who testified that the body was found near the head of the stairway. Moreover, acting Chief Farrel describes the place where the body was found as in the hall on the fourth floor, "at the landing from the

third floor"; and says, "There was a stairway leading from that fourth floor into the attic, close to where the body was found." There was no confusion about the location of the stairway leading to the attic from the fourth floor, and therefore his testimony fixes the point in accordance with the finding of the court. Fireman Jacobs also locates the point where the remains of the testator were found in accordance with the finding of the court. The evidence fairly warrants the inference drawn by the trial judge that the body was found at the head of the servants' stairway, and that he was overcome there. It is argued from this fact that, after warning the girls, the testator attempted to retrace his steps, but was overcome by the smoke, heat, or flames, and must have quickly perished. The only other evidence with respect to the place where the body was found indicates that it was found some feet to the north of the head of the servants' stairway, in or opposite an aisle leading to the bathroom from the hall, opposite the opening over the main stairway, which it is claimed precludes any inference being drawn that he endeavored to return downstairs or as to when he was overcome. The remains of the servants who were sleeping on the fourth floor and did not escape were found in the attic at the head of the stairway leading from the fourth floor to the attic. It is argued from this that since the girls, after having been aroused by the testator, had time to get to the attic, he also had, and either was overcome there and his remains dropped to the fourth floor from the stairs or through the stairwell at the time or after the fire, or being unable to get out the scuttle hole, he started to retrace his steps and became bewildered at the fourth floor, and wandered about there seeking the descending stairway.

Significance is sought to be attached to the language in which the testator aroused the servants; and it is urged that it indicates that he was on his way to the scuttle hole in the roof and called to the maids to follow. Notwithstanding the language ascribed to him, it is more reasonable and probable to infer that he meant merely to call the servants out of their rooms to enable them to escape, or to aid in rescuing the other occupants of the house, among whom were young children, or in saving property, should there be time. It is not a reasonable inference that he would be more interested in rescuing the servants than his wife and sister-in-law and her helpless children, who, so far as the evidence shows, he had not even aroused at the time he alarmed the servants; and it is highly probable that he intended to return downstairs. But, be that as it may, the conclusion is fairly warranted by the evidence that life could not have been long sustained in the hallway on the fourth floor or stairway leading up or down therefrom after the testator was last heard on that floor, for the evidence indicates that the flames soon broke through the skylight and raged with great fury above the main stairway and adjacent thereto on the fourth floor and along the line of the servants' stairway and the attic stairway. The skylight and plaster and part of the floor and ceiling and the material from the attic and from the roof fell on the main stairway and fourth floor to the depth of about four feet, covering the body of the testator, which was burned to crisp. On the lower floors and on the third floor, where Mrs. St. John was, the destruction by the fire was not so great, and

there was very little damage in the front and rear, while above that floor the fire spread out and was much more destructive. The inference is fairly warranted that life was sustainable in the rooms on the third floor where Mrs. St. John and her children and the two maids were, until she opened the door leading to the main stairway, after they had evidently all arisen and prepared to leave that way.

It is not material whether the findings as made, that the testator perished immediately after he was heard on the fourth floor and before Mrs. St. John was found, and that Mrs. St. John lived several minutes after she was found, are fully sustained by the evidence. The question is: Does the evidence fairly warrant the finding that she survived him? The evidence tends to show that 10 minutes or more after the testator was last known to be alive she was found unconscious and prostrate on the floor of her room, with her feet extending over the sill of the door, which it was her custom to close and lock at night, into the hall and with her face toward the floor, and her child folded in her arms, as if she had been overcome on attempting to leave the room; that she was carried from the room to the roof of the extension in the rear, and from there to the extension of the Rothschild house and into a rear room and placed on a bed, and that, although she did not rally or regain consciousness, she showed distinct signs of life, and that her heart was beating feebly and she was breathing indistinctly to the eye, and was alive a very short time after being placed on the bed. The learned counsel for the heirs and next of kin in effect concedes that the evidence shows that Mrs. St. John was alive 10 or 15 minutes after the testator was last known to be alive. Counsel for other parties claim, and the evidence bears out their contention, that she was alive for a period considerably longer than 10 or 15 minutes after the testator was heard on the fourth floor. The inference is fairly warranted by the evidence that the testator could not have remained alive 10 minutes where he was last heard on the fourth floor, and where his charred body was subsequently found, no matter at which of the two points it was found. When the heat and pressure broke the skylight and the flames went through the roof to a height of 20 feet, it is altogether probable that they broke the window in the partition on the fourth floor, which was not far from where he was, and that the entire hallway on that floor was enveloped in flame, including the stairways up and down. Alice White jumped from her window before the firemen came, and before she jumped all was silent on the fourth floor, indicating that the testator and the maids could not or dared not speak for fear of suffocation. The flames must have been then enveloping the hallway and stairway, for she was quite severely burned, and she had only been to her door, which was 22 feet toward the rear from the head of the servants' stairway, and after that, and before Mrs. St. John was rescued, the flames enveloping the stairways and hallways and belching out through the roof are described by one of the firemen as "a raging furnace inside all the way up the stairways." No one, except those who escaped, reached a window. The finding, therefore, that Mrs. St. John survived the testator, is fairly sustained by the evidence.

The learned counsel for the next of kin and heirs at law, while insisting that no finding of survivorship is warranted as between the tes-

tator and his wife and Mrs. St. John, yet contends that, if the court should decide otherwise, then it should have been found that Mrs. Andrews survived her husband, and that the residuary bequest either to the Ohio corporation or the Smithsonian Institution would be void as to one-half, for it would be in violation of chapter 360, p. 607, Laws 1860, which provides as follows:

"No person having a husband, wife, child or parent, shall, by his or her last will and testament, devise or bequeath to any benevolent, charitable, literary, scientific, religious or missionary society, association or corporation, in trust or otherwise, more than one half part of his or her estate, after the payment of his or her debts (and such devise or bequest shall be valid to the extent of one half and no more)."

The preponderance of the evidence shows that the body of Mrs. Andrews, so burned that it fell apart, was found in the hallway on the second floor, a few feet from the door of her room, although there is evidence that it was found on the first floor at the foot of the main stairway. There is no other evidence shedding any light on the time of her death. On this point, under the rule already stated, for the purpose of determining property rights, it would have to be assumed that she and her husband died at the same time. If they died at the same time, then the testator could not be said to have left a wife him surviving. If, therefore, the statute only prohibits such gifts when the testator leaves a wife surviving him, then the burden was upon the next of kin to establish that fact, for upon it their right to participate, if they could participate in any event, depended. Garvey v. Union Trust Co., 29 App. Div. 513, 52 N. Y. Supp. 260; Garvey v. U. S. Fid. & Guar. Co., 77 App. Div. 391, 79 N. Y. Supp. 337. See, also, Gallagher v. Crooks, 132 N. Y. 338, 30 N. E. 746; City of Cohoes v. D. & H. Canal Co., 134 N. Y. 397, 31 N. E. 887. There being no evidence to justify a finding that the wife survived her husband, as to Mr. and Mrs. Andrews, the case falls within the general rule applicable to deaths in a common disaster. It is contended, however, that the scope of the statute is not confined to cases where a husband leaves a wife surviving, but that the will is invalid as to such bequest if the testator have a wife living at the time he makes the will. It is now well settled that a bequest or devise in violation of this statute is void and may be taken advantage of by others than those enumerated in the act of 1860; and consequently the heirs or next of kin have a standing in court to be heard on the question. Robb v. Washington & Jefferson College, 103 App. Div. 327, 93 N. Y. Supp. 92, affirmed 185 N. Y. 485, 78 N. E. 359. It is claimed that there is no authoritative decision on the precise point now presented; but I think the courts have considered that the validity of such bequests depends on survivorship of one of those enumerated in the act. See Robb v. Washington & Jefferson College, supra; Amherst College v. Ritch, 151 N. Y. 282–334, 45 N. E. 876, 37 L. R. A. 305; Matter of Will of Walker, 136 N. Y. 22–26, 32 N. E. 633. A will takes effect not at the time of its execution, but on the death of the testator, and its validity and construction depend not upon the law at the time of its execution, but at the date of his death. Parker v. Bogardus, 5 N. Y. 309; Doubleday v. Newton, 27 Barb. 431; Moultrie v. Hunt, 23 N. Y. 394. The purpose of the statute was not

to disqualify the beneficiary from taking, nor to prohibit a husband from making a will containing such a disposition of property, but to provide that in case a testator should die leaving such a survivor, and leaving more than one-half of his estate to such charitable use, the bequest should be void, except to the extent authorized by the statute. The object of the Legislature was not to compel a testator to make provision for his wife and family, but to admonish him of their claims upon his bounty, and to invalidate in part such a disposition of property in the event of his leaving a wife, child, or parent him surviving. Chamberlain v. Chamberlain, 43 N. Y. 424; Allen v. Stevens, 161 N. Y. 122, 55 N. E. 568; Hollis v. Drew Theolog. Sem., 95 N. Y. 166. No other construction of the statute would be reasonable. If the word "having" therein is to be construed as relating to the time of making the will, then the statute would have no application to marriages subsequent to the making of the will. A testator at the time of making a will seldom knows the value of the estate which he will leave. If the statute refers to the family status at the time of making the will, it must refer to his property status at that time also—which clearly it does not. The application of the statute depends upon an inquiry with respect to the value of the estate left; and it is the reasonable construction that the word "having" should be "leaving" him surviving.

In the view we take of the construction of the statute of 1860, it becomes unnecessary to decide the conflicting contentions of the next of kin and the Smithsonian Institution, with respect to the ownership of that part of the residuary fund which could not be bequeathed to a charitable use, under the provisions of that statute, if applicable, and with respect to the claim of the Smithsonian Institution, that, if the Andrews Institute for Girls could not take all the residue, it could not take any.

The Smithsonian Institution further claims that the bequest to the Ohio corporation to be formed failed because the testator intended the bequest to vest immediately upon the death of his wife, if at all, and that, since she did not survive him, it became a gift in præsenti at his death, and the corporation not being then in esse, the bequest failed and the property vested in, it, under the alternative clause of the will. The trial court found that the Andrews Institute for Girls takes all the residue, and that neither the Smithsonian Institution nor the heirs or next of kin take anything. Mrs. Andrews was much younger than her husband, and doubtless he contemplated her surviving him many years. He made bountiful provision for her support during life, and then made liberal bequests to those of his relatives whom he regarded as worthy of his bounty, and intended that the residue of his property, no matter how much or how little, should be used "for the purpose of establishing an institution" in the town of Willoughby, Lake County, Ohio, upon a farm owned by his wife and formerly owned by him, and, if that should not be available, "then on other suitable premises" in said town "for the free education of girls and for their support in proper cases during education, with a special view toward rendering them self-supporting." He specified the subjects upon which instruction should be imparted to the girls, and gave directions with respect to the erection of a suitable building and maintenance of the institution, and then directed that the

charter of the corporation should provide "if and so far as may be consistent with law and practicable" that the corporation should be managed by a board of five directors, consisting of the Governor of the state, the member of Congress for that district, the treasurer of that county, and the mayor of Willoughby, and their successors in office, and his brother-in-law, St. John, whose successor should be a resident of the town selected by the Governor. The direction with respect to the formation of the corporation was as follows:

"I direct my executor and executrix as soon as practicable after my decease and during the lives of my said wife and her said brother, or the life of the longest liver of them, to procure under the laws of the State of Ohio, an incorporation to be formed," with the powers specified.

It is to be observed that it was only in the event that his primary desire to endow the Ohio corporation could not be lawfully accomplished that he intended that the bequest should go to the Smithsonian Institution. The policy of the law favors upholding charitable bequests, whether they are to be administered at home or abroad, and, if to be administered abroad, the right of the foreign legatee to take will be determined by our courts before directing the executors to turn over the fund, but under the law of the foreign jurisdiction and unaffected by our laws relating to accumulations and perpetuities. Matter of Huss, 126 N. Y. 537, 27 N. E. 784, 12 L. R. A. 620; Amherst College v. Ritch, 151 N. Y. 282, 45 N. E. 876, 37 L. R. A. 305; Hollis v. Drew Theolog. Sem., 95 N. Y. 166; Hope v. Brewer, 136 N. Y. 126, 32 N. E. 558, 18 L. R. A. 458; Cong. Unitarian Soc. v. Hale, 29 App. Div. 396, 51 N. Y. Supp. 704; Matter of Sturgiss, 164 N. Y. 485, 58 N. E. 646; Robb v. Wash. & Jef. Col., supra. The charity which the testator was desirous of establishing in Ohio was commendable, and the court should not be astute to discover legal objections to giving effect to his intention. The will does not, as claimed by the counsel for the Smithsonian Institution, show that the testator did not intend that the Ohio corporation should take if not formed before the death of his wife. He provided, in effect, that it might be formed by the other executor and trustee, should it not be formed before her death, and he expressly provided that it should take the bequest, even though she predeceased him. There is no force in the argument that this was merely a restriction or limitation as to the period within which the corporation must be formed, or that it does not carry with it, either expressly or by implication, permission to form it after the death of his wife. His intention thus clearly manifested and public policy demand that the Andrews Institute, which his executor caused to be incorporated pursuant to his command, and which fulfills in all respects his purpose, shall receive the bequest if consistent with the rules of law. Amherst College v. Ritch, 151 N. Y. 282, 45 N. E. 876, 37 L. R. A. 305; Dammert v. Osborn, 140 N. Y. 30, 35 N. E. 407. The will is susceptible of the construction that the bequest was to vest in the corporation, if in esse upon the death of his wife, but, if not then in esse, that it was to vest in it when formed by the trustee who survived his wife; and in such a case a present bequest is not to be presumed, and, if a construction that the bequest was to vest in the corporation when formed would render it valid, that construction should prevail. Burrill v. Boardman,

44 N. Y. 258, 3 Am. Rep. 694; Robb v. Wash. & Jef. Col., supra; People v. Simonson, 126 N. Y. 299, 27 N. E. 380. If we should construe the will as indicating an-intent on the part of the testator that the bequest was to vest on his own death if his wife predeceased him, and on her death if she survived him, even though the corporation had not then been formed, it would doubtless, unless sustainable under chapter 701, p. 1748, Laws 1893, be void, since the beneficiary was not then in esse, and in that view would have been incapable of taking, and its subsequent incorporation would not avail it. Booth v. Baptist Church, 126 N. Y. 215, 28 N. E. 238; White v. Howard, 46 N. Y. 144. See, also, Murry v. Miller, 85 App. Div. 414, 83 N. Y. Supp. 591. The corporation was required to be formed within two lives in being, and, in the case of bequests for charitable use, the law, without regard to whether chapter 701, p. 1748, Laws 1893 applies or not, permits the suspension of ownership and the power of alienation during a period necessary to form a corporation, not exceeding two lives in being at the death of the testator, to take the bequest which in such circumstances is valid as an executory devise or bequest. Tilden v. Green, 130 N. Y. 29, 28 N. E. 880, 14 L. R. A. 33, 27 Am. St. Rep. 487; Burrill v. Boardman, 43 N. Y. 254, 3 Am. Rep. 694; Inglis v. Trustees, etc., 3 Pet. (U. S.) 99, 7 L. Ed. 617; Shipman v. Rollins, 98 N. Y. 311. In the case at bar it was impossible to form the corporation pursuant to the will before her death.

The learned counsel for the Smithsonian Institution also contends that the Andrews Institute for Girls was not legally incorporated, and therefore cannot take the bequest. It is not claimed that the regularity of the incorporation or organization can be questioned collaterally, as clearly it cannot; but it is insisted that the corporation may be shown to have no legal existence because incorporated in violation of the Constitution of that state. Owing to the provisions with respect to the management of the corporation by a board of five trustees, four of whom were to be officials, it was deemed advisable to apply to the Legislature for the enactment of a general law under which the corporation could be formed. The act was passed on the 19th day of March, 1902. Laws Ohio 1902, p. 61. It contains no specific reference to this will or to the bequest to the Ohio corporation to be formed. The title of the act, "An act to confer corporate powers upon individuals selected under certain specified conditions," is general, and the act is general in terms and relates to devises and bequests for charitable uses, "or for the establishment and maintenance of any industrial or educational school or institution to be located at any place within this state, heretofore or thereafter made, and provides for the formation of a corporation by the executor and officials designated in the will, referring to wills providing for the management of the corporation by a board of trustees or directors consisting in part of the officials of the state, county, municipal corporation, and member of Congress for the District in which the charity is to be administered, or institution or school is to be located." The Andrews Institute was thereafter incorporated by filing a certificate of incorporation, which does not specify, and was not required

to specify, the particular statute or statutes under which it was filed. Many general statutes of the state are cited from which it is claimed authority for the incorporation exists, with the possible exception of the management of the corporation by such officials, and this statute of March 18th is relied upon as authority for the corporation in that regard. The contention is that the statute is in contravention of paragraph 1 of article 13 of the Constitution of Ohio, which provides that "the General Assembly shall pass no special act conferring corporate powers." It is quite likely that the corporation could be sustained under other statutes, even if the provisions of the act of March 18, 1902, with respect to the composition of the board of trustees should be declared invalid. See sections 3235, 3236, 3238, 3726, 3727, and 3734, Bates' Ann. St. of Ohio, and section 1, p. 2279, Bates' Ann. St. of Ohio; 53 Ohio Laws, p. 33. These statutes, among other things, authorize the formation of a corporation for any purpose for which individuals may lawfully join, except for carrying on professional business, and provide for filling vacancies in the board of trustees from any cause, and for the management of schools or academies receiving bequests and devises by the court of common pleas, where the management is not otherwise provided for, and for the execution of the trusts upon which the property was bequeathed or devised. Nor does the argument that this is a special act in violation of the Constitution seem tenable. State ex rel. v. Spellmire, 67 Ohio St. 86, 65 N. E. 619. It is exceedingly doubtful whether in any event we would be justified in refusing to allow the Andrews Institute to take this bequest upon the theory that it has no corporate existence, when, so far as appears, it is recognized by the state and no proceeding has been taken to have its charter either annulled or forfeited. State v. Gardner, 54 Ohio St. 24, 42 N. E. 999, 31 L. R. A. 660; Bartholomew v. Bentley, 1 Ohio St. 37; Trustees v. Hill, 6 Cow. 23, 16 Am. Dec. 429; Lamming v. Galusha, 81 Hun, 247, 30 N. Y. Supp. 767; Cooley's Const. Lim. (5th Ed.) 311; Cook on Corpns. (5th Ed.) 637; Thompson on Corpns. § 501; Coast Co. v. Spring Lake, 56 N. J. Eq. 615, 36 Atl. 21; Merrick v. Van Santvoord, 34 N. Y. 208; U. S. Vinegar Co. v. Schlegel, 143 N. Y. 537, 38 N. E. 729. Under the authority to determine whether the legatee is competent to take the legacy, we, of course, are authorized to determine the extent of the corporate authority, but the corporate existence is quite another thing. While I think the Andrews Institute was legally incorporated, it is at least a de facto corporation acting under color of law, and apparently recognized by the state under whose laws it has sprung into existence and with little likelihood of its corporate existence being drawn in question.

The learned counsel for the heirs and next of kin claims that the testator died intestate as to the rents and income of the residuary estate, accruing between the time of his death and the date of incorporation of the Andrews Institute, and that the next of kin take such rents and income. This claim is founded upon section 51 of the real property law (Laws 1896, p. 568, c. 547) and section 4 of the personal property law (Laws 1897, p. 508, c. 417), which forbid the accumula-

tion of rents and income, respectively, except for the benefit of minors during minority, and upon section 53 of the real property law and section 2 of the personal property law, which, respectively, provide with respect to the accumulation of rents and income that, where there is a suspension of the power of alienation or of ownership in consequence of a valid limitation of an expectant estate "during the continuance of which the rents or income are undisposed of and no valid direction for their accumulation is given," the rents or income "shall belong to the persons presumptively entitled to the next eventual estate."

By the seventh clause of the will, the executor and executrix were directed, "as soon as they may deem advisable but within two years after" the decease of the testator, to sell all of his real estate, and invest the proceeds in interest paying securities, and he therein gave them and his trustees "power to invest and reinvest" all of his estate or any part thereof. The learned counsel for the heirs contends that the sole purpose of this power of sale was to enable the executor and executrix and trustees to execute the trust for the benefit of the widow, and that since she did not survive the testator that trust never came into existence, and therefore there was no equitable conversion of the real estate. He argues from this that the title to the real estate vested in the heirs, subject to be divested upon the incorporation of the educational institution as directed by the testator, and that consequently they would be entitled to the rents, issues, and profits until their title became divested. It is not essential that we should agree or disagree with the ultimate result that would flow from this process of reasoning, for we think there was an equitable conversion of the real estate; but it may be observed that the Smithsonian Institution would not be without argument to show that, if title did not vest in the personal representatives or trustees, it vested in that institution. The rule is that if it be essential to carry out the plan of the testator that his real estate be converted into personalty, then the real estate will be deemed converted into personalty as of the date of his death. Here the personal representatives were directed, not only to incorporate and organize the educational institution, but, in effect, to turn over to it the residuary estate in cash, to enable it to purchase a site and erect a building with one-tenth thereof, and to provide for the support and maintenance of the institution with the remaining nine-tenths. This intention is quite clear; for in the fifth clause of the will, after giving directions with respect to the purchase of a site and the erection of a building and the porportion of the amount received to be used for that purpose and the investment of the remainder, he, in providing for deferring the completion of the institution in the event that the one-tenth of the bequest should be insufficient, uses this significant language: "If when the said sum shall be received by the corporation." It is, of course, possible that the corporation might be able to take the property as it stood at the time of the death of the testator, subject to the payment of his debts and other bequests and devises; but manifestly that was not what he intended, and it would have been quite impracticable. On this point I

think that no significance is to be attached to the fact that, in giving this residuary estate to the corporation to be formed, the testator used the word "devise" as well as "bequeath." There was, therefore, an equitable conversion of the real estate, and the plaintiff, if not by express authority, at least by necessarily implied authority, held the property in trust to form the corporation and deliver it over in money in accordance with the wishes of the testator, which constitutes a perfectly lawful trust as to personalty, which by the equitable conversion the residuary estate has become. The bequest was, in a sense, in trust to the Ohio corporation; but not in a strict sense which would invalidate it as contravening the statute against perpetuities and accumulations of income and rents, because gifts in trust for charitable uses have long been deemed absolute gifts, so far as the settlor or testator is concerned, in order to enable the beneficiary of a commendable endowment, bequest, or devise to take. Holland v. Alcock, 108 N. Y. 312, 16 N. E. 305, 2 Am. St. Rep. 420; Matter of Griffin, 167 N. Y. 71, 60 N. E. 284; Bird v. Merklee, 144 N. Y. 544, 39 N. E. 645, 27 L. R. A. 423. The scheme for the administration of the trust in this case would be valid under our laws; but its validity depends upon the law of Ohio, where it is to be administered, and it is for our courts to decide the question before turning the fund over to the beneficiary. Robb v. Wash. & Jef. Col., 103 App. Div. 327, 356, 357, 93 N. Y. Supp. 92; Matter of Sturgiss, 164 N. Y. 485, 58 N. E. 646.

It is not contended but that the laws of Ohio authorize the execution of such a trust. The learned counsel for the heirs and next of kin, however, strenuously argues that, inasmuch as this income accumulated before the property vested or could vest in the Ohio corporation, its ownership depends on our laws; and there is much force in that contention. However, even under our laws, we think that the Andrews Institute took this income. It is to be observed that the testator gave no direction, either valid or invalid, for the accumulation of rents or income. It is not, therefore, a case of a void legacy. The claim seems to be that, although all of the residuary estate was lawfully bequeathed and devised to the Andrews Institute for Girls, yet that as to the income and rents earned and accruing therefrom after the death of the testator —who, being dead, did not and could not own them—he died intestate. It is conceded by the learned counsel for the heirs and next of kin that, if the act of 1860 does not apply, the Andrews Institute for Girls took the entire residuary estate upon its incorporation as an executory bequest or devise; but he insists that the income and rents when they accrued vested in some one, as the statute prohibited their being accumulated and added to the principal, whether by the express or implied direction of the testator, or by his having failed to give any direction concerning them, and that they could not vest in the foreign corporation because it was not then in being. It cannot be denied that there is force in this contention, and that there are decisions, although not in point on the facts, tending to sustain it. See Vail v. Vail, 4 Paige, 317; Pray v. Hegeman, 92 N. Y. 508; Hascall v. King, 162 N. Y. 134, 56 N. E. 515, 76 Am. St. Rep. 302; Manice v. Manice, 43 N.

Y. 303; U. S. Trust Co. v. Soher, 178 N. Y. 442, 70 N. E. 970; Killam
v. Allen, 52 Barb. 605.   A bequest to a corporation to be formed after
the death of the testator being valid, it would seem to follow, although
there appears to be no controlling precedent on the point, that, in the
absence of any direction with respect to the income, the testator in-
tended that the corporation should take the income, if any should
accrue prior to its formation, as an increment of the principal, and that
it. should not be regarded as income within the contemplation of the
statutes regulating perpetuities and accumulations of income, and that
the executor or trustee who is holding the property by express or im-
plied authority for the corporation when formed would be authorized
also to hold the increase thereof, and that the corporation should take
both as if it had been formed as soon as the bequest could have vested.
See Hendricks v. Hendricks, 3 App. Div. 604, 38 N. Y. Supp. 402,
affirmed 154 N. Y. 751, 49 N. E. 1098; Duncklee v. Butler, 38 App.
Div. 99, 56 N. Y. Supp. 491; Fowler on Charitable Uses, Trusts &
Donations, pp. 150, 151, and note.   It was essential that some period
should elapse to enable the executor to form the corporation, but that
might have been very short.   The fact that in this case it was unavoid-
ably extended cannot affect the question.   In the case at bar, how-
ever, I think it is immaterial whether the Andrews Institute could take
this increase under the will; for, if not, I am of opinion that it would
take it under the statute, as being manifestly entitled to the next even-
tual estate, upon the theory that the estate had not then vested in the
corporation, which was not in existence; and in that view the corpora-
tion would take the next eventual estate.   See Matter of Crossman, 113
N. Y. 503, 21 N. E. 180.   Within the plain meaning and intent of the
statute, it was the expectant estate which this corporation now takes,
concerning which there was a valid limitation suspending the power
of alienation and the ownership, and, as it is the party first taking the
estate after the suspension, it necessarily is the party entitled to the next
eventual estate.   See Manice v. Manice, 43 N. Y. 303, 385; U. S.
Trust Co. v. Soher, 178 N. Y. 442, 70 N. E. 970.

The learned counsel for the plaintiff argues that the Smithsonian
Institution is the party entitled to the next eventual estate, upon the
theory that the statute has reference to the party thus presumptively
entitled at the time the income accrues, and that, inasmuch as the
Andrews Institute for Girls had not been incorporated at the time the
income in question was earned, it could not at that time have been pre-
sumptively entitled to the next eventual estate.   The Court of Appeals
did not take that view in U. S. Trust Co. v. Soher, supra, and the
Smithsonian Institution makes no claim to income unless it is entitled
to all or part of the principal.   I am of opinion that the same liberal
rule permitting such bequests to a corporation to be formed should be
extended to authorize the holding of the income, to enable the corpora-
tion when formed to take both, upon one or the other of these theories,
even though that be an exception to the general rule.

It follows that the judgment should be affirmed with separate bills
of costs to all parties separately appearing to be paid out of the estate.
All concur.