in terms as required by the contract, even if such were the fact. To state the contract in plain English, the defendant agreed to pay $3,500 for the premises in question in case he was given good title to the same. Such good title was tendered to him, but he refused to pay and complete his purchase, because, as alleged, a preliminary search required to be delivered to him under the contract did not show that plaintiff could convey such good title. We think such preliminary search conformed to the requirements of the contract, that the plaintiff performed all other conditions imposed thereby upon her, and that the defendant, without reasonable cause or excuse, seeks to avoid his obligations thereunder. It follows that the judgment appealed from should be reversed, and a new trial granted, with costs to the appellant to abide event.

Judgment reversed, and new trial granted, with costs to appellant to abide event. All concur, except WILLIAMS, J., who dissents.

---

(119 App. Div. 440)

## In re McINNES.

### In re GERDES' ESTATE.

(Supreme Court, Appellate Division, Second Department. May 10, 1907.)

1. DEATH—SURVIVORSHIP—PRESUMPTIONS.

   There is no presumption of survivorship in the case of persons who die in a common disaster; and, in the absence of satisfactory evidence of survivorship, property will be disposed of as if death occurred at the same time.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Death, § 7.]

2. SAME—EVIDENCE—SUFFICIENCY.

   Evidence examined, and held to show that, where a husband and wife perished in the same disaster, the wife predeceased her husband, requiring the distribution of her estate accordingly.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Death, § 9.]

Appeal from Surrogate's Court, Kings County.

In the matter of the judicial settlement of the account of James McInnes, as executor of the estate of Margaretha Gerdes, deceased. From a decree of the Surrogate's Court (100 N. Y. Supp. 440, 50 Misc. Rep. 88), settling the account, Diedrich Ottersted and another, executors of the will of Henry Gerdes, deceased, appeal. Reversed.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, HOOKER, and GAYNOR, JJ.

E. R. Thompson, for appellants.
John De Witt Warner, for respondents.

HIRSCHBERG, P. J. The testatrix left personal property only. She left neither parent nor descendant surviving her. Both she and her husband were victims of the disaster which resulted in the burning and wreck of the steamer General Slocum on the forenoon of June 15, 1904. Her body was recovered on the day of the accident, and that of her husband about one week afterward. The question chiefly litigated in the court below, and the only one presented on this appeal, was whether there was evidence sufficiently establishing the fact that

her husband survived her. The learned surrogate has found that there was not sufficient evidence to establish survivorship of the husband, and has ordered distribution of the estate on the theory that they perished together.

The burden of proof of survivorship rests on the appellants. The law is settled in this state that there is no presumption of survivorship in the case of persons who die by a common disaster. In the absence of satisfactory evidence, the fact is assumed to be unascertainable, and the property rights are disposed of as if death occurred at the same time, not because of the presumption of simultaneous death, but because of the absence of evidence or presumption to the contrary. Newell et al. v. Nichols et al., 75 N. Y. 78, 31 Am. Rep. 424. See, to like effect, St. John v. Andrews Institute for Girls et al. (App. Div.) 102 N. Y. Supp. 808.

I think the evidence very clearly establishes the fact that the testatrix died before her husband. The boat took fire while proceeding up the East river, at some point below 134th street, and between 134th and 135th streets passengers were seen jumping or falling into the river. Mrs. Gerdes was one of the first, and her body, if the identification is sufficient, was brought ashore and laid upon a float at the foot of 138th street while her husband was standing on the hurricane deck, where he remained until the boat was beached and went to pieces at the "Sunken Meadows," near North Brother Island. That Mr. Gerdes remained alive upon the boat until it was beached is undisputed, and the controversy accordingly depends on the question whether the body on the float referred to was that of Mrs. Gerdes. A yachtsman named Orth, who was rowing a skiff at the time the fire broke out, picked up and brought to the float three bodies, one a middle-aged woman, one a gray-haired woman about 70 years old, that being the age of Mrs. Gerdes, and a baby. They were the first bodies brought ashore. He brought them ashore dead, as I have said, some little time before the Slocum was finally beached. They were laid out on the float and shortly afterwards delivered by him to Mr. Daub, by whom they were in turn transferred to the police, and by the police taken to the Alexander Avenue station house. The bodies were removed from the station house to the morgue on the afternoon of June 15th, whence the one identified as that of Mrs. Gerdes was taken by her family on the next day and buried. Orth described the woman of 70, but he was not acquainted with Mrs. Gerdes, and could not recognize the body as hers from a photograph exhibited to him upon the trial. He testified that:

"She had some of the features of it; but I could not swear it was the same person, because in a case like that there was a great deal of excitement around."

Daub, however, described the body very minutely. On being shown the photograph of Mrs. Gerdes, he said that it resembled the woman a great deal, and added: "I could swear that that is the woman." Christian D. Postel, a son-in-law of Mr. Gerdes, went to the Alexander Avenue station house on the afternoon of June 15th, and there identified the body in question as that of Mrs. Gerdes. He went to the

morgue the next day, found the same body, identified it as the same, and had it removed to her home by the undertaker. Daub testified that when the body was taken from the water there was a scratch or cut at the side of the head on the forehead, and that he remarked at the same time that she had been hit by something. The mark was on the right side. Christian D. Postel also described the mark as existing when he first saw the body at the station house. He said:

"She had a scar about a trifle over an inch long right over her right temple, near the right eye."

But this evidence was given by him on re-examination, after Daub had testified. The learned surrogate regarded it as a suspicious circumstance that he had not referred to the scar or cut on his first examination; but his attention had not then been specifically called to it, and it is plain that it could have no significance to him as a mark of identification. Mrs. Gerdes bore no such mark in her lifetime, and the identification by this witness was from her features and her clothing. As the body had been in the water only a few minutes, I do not see, aside from the aid of voice and expression, how the process of identification could have been much more difficult than it would have been if Mrs. Gerdes had returned home from the accident, wet from the immersion, but uninjured. It may be assumed that a man can recognize his mother-in-law when he sees her. Some effect was given by the surrogate to the fact that Mr. Postel, when first on the witness stand, replied, in answer to a question, that the face of the deceased was not injured in any way. I do not think his evidence then given militates at all against his subsequent assertion that the body bore the cut alluded to when he found it at the station house. The evidence given by him was as follows:

"Q. Was her face battered in any way? A. No, sir. Q. So you could plainly see who it was by her features? A. Yes, sir."

The witness might very well overlook the existence of this slight scratch, not regarded as a mark of identification at the time he first saw it, when asked if the face or features were so battered as to be unrecognizable.

But there is considerable other evidence tending to establish the fact that the body did exhibit the scar in question. The brother of Mr. Postel, who viewed the remains when the body was brought to the house, testified that there was a bruise at the side of the face around the temple. The undertaker swore that he saw the cut on the side of the face just above the eyebrow, and stated that it was about an inch and a quarter long. The lady who prepared the body for burial testified that she saw the cut, that it was a slight one, that she thought it could be covered with powder so as not to be noticed, and that she obtained some powder and used it for that purpose, so that the mark was practically obliterated. As against this evidence there is only the testimony of two ladies, each of whom stated that she did not see the bruise or cut. There was other evidence given on behalf of the respondents, which may be regarded as somewhat material, but certainly not as controlling. But, in the absence of any evidence tending to indicate that the body received from the morgue was not

that which was brought to the float, the time of the death of Mrs. Gerdes must be deemed to have been established as prior to that of her husband, so far as could be expected of human evidence in the circumstances.

There was one other feature of identification which has some force and significance. Mrs. Gerdes was in the habit of wearing a rubber stocking, and learning from his wife, Mrs. Gerdes' stepdaughter, that she had it on on the occasion in question, Mr. Postel had the fact verified before the removal of the body from the morgue. He testified as follows:

"Q. There was no necessity of referring to such things as rings on the finger, or some peculiar birthmark on some part of the body, was there? A. No; but, to make sure, Mrs. Gerdes had always worn a rubber stocking. I went and asked her daughter if she had one of those on; so I came back again, and I asked the lady there if she would kindly look to see if she had it on. Q. Did she have it on? A. Yes, sir. Q. Was this body that you have seen on those two occasions the body that was brought by you to the home? A. Yes; by the undertaker. Q. It was buried as the body of Mrs. Gerdes? A. Yes."

There is other evidence in the case which tends to some extent to support the claim that Mrs. Gerdes either jumped or was thrown into the water, and was drowned while her husband was still alive. One of the witnesses, who knew them both, testified that as the boat was going up the river, before the fire, she saw them sitting on the middle deck, just under the hurricane deck, close against the rail, on the port or Manhattan side of the boat, "right alongside of each other." Mr. Gerdes was an old man of 80. There is no question about the identification of both of them at that time. They were only six or eight feet away from the witness, and a lady friend who was with her went over to see them, saying that she was going over to speak to Mr. and Mrs. Gerdes. She did as she said, and after seeing them came back and sat with the witness. Another witness testified that shortly after the fire broke out she saw Mr. Gerdes standing on the hurricane deck, all alone. That was the last she saw of him before the boat was beached. She had known him from her childhood. It is true that she was not acquainted with Mrs. Gerdes, but she knew that Mrs. Gerdes was on the excursion. Being shown the photograph of Mrs. Gerdes, she testified that she did not recognize any person on the hurricane deck of whom that was a portrait. She testified that at the time when she last saw him the fire was pretty well advanced, that he was standing on the left side of the deck, looking towards the fire, standing in a dazed way with an umbrella in his hand, and that "there was nobody around him."

An old man and an old woman, husband and wife, sitting together at the commencement of such a disaster, would be unlikely to part company unless by stress of the calamity. The evidence of these two witnesses indicates that something must have happened to Mrs. Gerdes to prevent her from going upon the hurricane deck with her husband, and the other proof in the case tends to establish that the thing which happened was that she had fallen or was thrown into the water, and

that her lifeless body was on the float at 138th street while her husband was standing alone upon the hurricane deck awaiting the final wreck.

The decree should be reversed, with costs to the appellants, payable out of the fund, and the proceedings remitted to the Surrogate's Court for distribution of the estate on the theory that the testatrix left her husband surviving her. All concur.