(65 Misc. Rep. 422.)

### In re LOTT et al.

(Surrogate's Court, Kings County. December, 1909.)

**1. DEATH (§ 6*)—SURVIVORSHIP—BURDEN OF PROOF.**

Where executors bring a proceeding for the settlement of their account, the burden of proof is on those claiming under a gift of decedent's personal estate to his wife by his will, where both husband and wife perished on the same occasion, and under such circumstances that it is doubtful which died first.

[Ed. Note.—For other cases, see Death, Dec. Dig. § 6.*]

**2. DEATH (§ 5*)—PRESUMPTION OF SURVIVAL.**

Where husband and wife perished in the same casualty, no presumption arises of the survival of either, so as to enable one to inherit or take by will from the other.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 7; Dec. Dig. § 5.*]

In the matter of the last will of Adolphus Bennett, deceased. Proceedings for the settlement of the accounts of Charles H. Lott and Moe S. Lott, executors. Decree rendered.

See, also, 60 Misc. Rep. 28, 112 N. Y. Supp. 592.

Charles F. Moody, for accounting executors.

Delos McCurdy, for executor of Mary E. Bennett.

Hubbard & Rushmore (James C. Church, of counsel), for executors of William R. Bennett.

James C. Church, for Katharine R. Bennett and others.

KETCHAM, S. This is a proceeding for the judicial settlement of the accounts of executors. Under the will of the testator, his wife was the sole beneficiary. The wife has died, leaving a will which contains specific and residuary gifts. Both testators died under circumstances which make necessary this inquiry to determine whether, by the wife's survival of her husband, his estate vested in her and passed in turn from her by her will, or, by her failure to outlive her husband, his estate became subject to the laws relative to intestacy. The account concerns personalty only, and the conflict is confused by the fact that one of the executors of the husband's will is not only the sole surviving executor of the wife's will, but is the father of certain legatees therein named. The executor, occupying this dual attitude, has properly retained independent counsel to represent him in each of these relations. The trial proceeded upon the ruling that the affirmative of the issue as to whether Mrs. Bennett survived her husband was with those who claimed under the devise in the husband's will; but the court is now asked to reconsider this view upon the briefs presented.

If the duty of opening the proof was erroneously imposed, it was a substantial invasion of a right, and a new trial would follow. Woodriff v. Hunter, 65 App. Div. 404, 73 N. Y. Supp. 210, and cases cited. It is merely the question as to procedure in developing the evidence, and not the weight or value or preponderance of proof, that is in-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

volved in this reargument. It is insisted that, whatever may be the general rule of evidence, the burden was assumed in this instance by the persons claiming the intestacy of Mr. Bennett, because they brought a proceeding to require these executors to account, and therein not only alleged that Mrs. Bennett predeceased her husband, but prevailed upon the acceptance of that allegation. This argument is stated in behalf of the executor Moe S. Lott, as follows:

"These next of kin, from the death of Adolphus Bennett to the present hour, have stood in this court asserting that they are entitled to his property, notwithstanding his will to the contrary, for the sole reason that he survived his wife—that he lived the longest, and, consequently, that the gift in his will lapsed. (1) All authority agrees that he who makes this assertion assumes the burden of proving it."

It is true that he who makes an assertion assumes the burden of proving it; but it is true only with this obvious qualification, that the assertion must be made in the proceeding in which the question as to burden arises. There is the same separation between the compulsory proceeding and the present proceeding as there is between two actions between the same parties upon independent causes of action for wholly diverse relief; and neither in an action nor in a proceeding was it ever heard that resort could be had to the pleadings in the former case to determine the nature of the later issue. The former proceeding had ended before this present proceeding commenced. The latter has its own pleadings and by them only are its issues to be defined.

"The law is settled in this state that there is no presumption of survivorship in the case of persons who die by a common disaster. In the absence of satisfactory evidence, the fact is assumed to be unascertainable, and the property rights are disposed of as if death occurred at the same time, not because of the presumption of simultaneous death, but because of the absence of evidence or presumption to the contrary." Matter of McInnes, 119 App. Div. 440, 104 N. Y. Supp. 147.

This expression was limited to the consideration of the preponderance of proof and was not addressed to the question as to who held the affirmative, but the rule as to the presentation of evidence seems to be therein involved, for if in a case absolutely bare of evidence the law will conclude that the deaths were simultaneous, and will dispose of property rights as if upon a finding that both persons died together, then the duty of opening and closing the proofs must rest upon him who would be defeated if no proof were taken.

It cannot be denied that, if Mr. and Mrs. Bennett died at the same moment, the wife would not take under the husband's will. Matter of Wells, 113 N. Y. 396, 21 N. E. 137, 10 Am. St. Rep. 457; St. John v. Andrews Institute, 117 App. Div. 698, 102 N. Y. Supp. 1136.

In the case last cited not only is the doctrine stated as to the result of the evidence when taken, but the guide for the taking of evidence is given as follows:

"When, therefore, evidence was adduced showing that they all met death in the same conflagration, it was incumbent upon the administrator of Mrs. St. John (legatee in the will in question), in order to entitle him to receive the legacy given to her under the will, to prove facts and circumstances tending to show that she survived the testator, and the burden of proof of establishing this fact, upon which his right to the legacy depended, was upon him."

In Newell v. Nichols, 12 Hun, 604, is found the opinion of Mr. Justice Van Vorst, frequently resorted to and always with admiration as the repository of the learning material to this discussion. In that opinion it was held, as to persons who perished in a common disaster, that "the burden of establishing the survivorship rests upon the party who claims any portion of the estate through such fact." This result was affirmed by the General Term and the Court of Appeals, without attempt to add to the reasoning upon which it was based. See Id., 75 N. Y. 78, 31 Am. Rep. 424.

In Young Women's Christian Home v. French, 187 U. S. 401, 23 Sup. Ct. 184, 47 L. Ed. 233, the facts appeared by stipulation, and no controversy as to which party should open and close the debate was possible. The Supreme Court says:

"The rule is that there is no presumption of survivorship in the case of persons who perish by a common disaster, in the absence of proof tending to show the order of dissolution, and that circumstances surrounding a calamity of the character appearing on this record are insufficient to create any presumption on which the courts can act. The question of actual survivorship is regarded as unascertainable, and descent and distribution take the same course as if the deaths had been simultaneous."

And, as suggested, supra, with regard to equivalent words in the McInnes Case, 119 App. Div. 440, 104 N. Y. Supp. 147, the intimation from this language, not to be avoided, is that the party who would fail if the deaths were simultaneous must make the first proof.

In all the American cases on the subject, the case of Underwood v. Wing, 4 De Gex, M. & G. 633, is adopted as the basis of the rule of evidence in this country. In that case the reason for the imposition of the affirmative upon the party alleging survivorship is stated as follows:

"In the absence of any effectual disposition of the beneficial interest in the personalty, the next of kin is entitled to it, and the person seeking to dispossess him of it is bound to prove a perfect title, and to rebut the prima facie case of the next of kin. * * * Where a person dies seised in fee of real estate, prima facie his heir at law is entitled to succeed, and he can only be deprived of that right by some devisee coming forward and showing that a will valid in point of form and effectual in point of substance was made displacing his rights. I am perfectly persuaded that exactly the same principle is applicable to the case of personal estate: If a person dies possessed of personal estate, prima facie the next of kin will be entitled to it, and their right will only be displaced by some person coming forward and showing a valid and effectual disposition taking it away from them. * * * On whom does the burden of proof rest to show whether the wife did or did not die in the testator's lifetime? I think, the principle once being admitted that the prima facie title is in the next of kin, that it must rest on the person who claims the property under a bequest giving it to him in that particular event. It is not for the next of kin to show that the wife did not die in her husband's lifetime; but the person who claims under the disposition must show, not that probably it might be one way or the other, but that that state of circumstances did in fact occur which entitles him, according to the language of the will, to say that the wife did die in her husband's lifetime."

There seems to be no occasion for retracting the theory upon which the trial was conducted, and there remains the question of fact: Did Mrs. Bennett survive her husband?

The known facts are as follows: On February 3, 1908, between 10:30 and 11 o'clock in the evening, there were no persons in the home of the decedent except himself, his wife, and Margaret Wigley, a servant who had been in their household for 14 years. The maid, having retired for the night, came from the upper part of the house in response to the call of Mr. Bennett. Mrs. Bennett was then lying on the floor, where she remained to the end of her life. The husband left Mrs. Bennett in the care of Miss Wigley and went to his brother's house, about 100 feet away. His nephew, J. Remsen Bennett, summoned from the neighboring house, immediately came to the house in which Mrs. Bennett was lying, and was immediately followed by his uncle, the decedent. The night was cold and windy. It is partially shown, and may well be assumed, that the decedent, Mr. Bennett, exerted his utmost strength in the journey to his brother's house and return. While Mr. Bennett and his nephew, J. Remsen Bennett, were in the room opening into the room in which Mrs. Bennett was lying, Mr. Adolphus Bennett lost consciousness, was momentarily supported upon his feet by his nephew, and was by the latter lowered to the floor, about 15 feet from the place where Mrs. Bennett lay. Upon the call of Mr. J. Remsen Bennett, the maid thereupon left the side of Mrs. Bennett, after the husband was stricken, and ministered to the latter. She did not return to the side of her mistress. Neither she nor any person gave any care or attention to Mrs. Bennett, from the time when Mr. Bennett sank to the floor until the time when the family physician pronounced both husband and wife dead, and they were carried to the upper part of the house for the care which the dead require. At about 20 minutes past 11, Dr. Ager arrived, looked at Mrs. Bennett from a distance of more than 15 feet, and gave his attention to Mr. Bennett, until persuaded that he was beyond aid. Before the arrival of the doctor, Mr. Moe S. Lott, who lived in the neighborhood, and Miss Katharine Bennett, who had both been called by telephone from their homes in the immediate neighborhood, came to the decedent's house; but their testimony is not given, and there is no suggestion that either of them took any part in the attempt to restore the life of either Mr. or Mrs. Bennett.

Upon this texture of conceded proof, dispute is imposed by the testimony, on the one hand, of Margaret Wigley, tending to show that Mrs. Bennett survived her husband, and the testimony of J. Remsen Bennett and Dr. Ager of contrary effect.

Miss Wigley testifies that, at the time that Mr. Bennett was stricken, she felt the pulse of Mrs. Bennett beat; that it was beating when she went to Mr. J. Remsen Bennett, who was holding his uncle; that at the same time Mrs. Bennett was breathing; that she (the witness) could see the movement of her chest; that her chest was moving up and down; that the movement of her chest was a natural movement as (far as) she could see; that Mrs. Bennett's face was perfectly natural, not drawn up or discolored, or anything of that kind. As to Mr. Bennett, Margaret Wigley says that when he was lowered to the floor he was not breathing, that he had the appearance of a man who was dead, and that he never moved again.

Mr. J. Remsen Bennett testifies that when he entered the room in which his aunt was lying he noticed the appearance of her face; that it was very white and drawn; that her whole face was drawn; that as to her general complexion his aunt at times had considerable color; that previous to this time she was very full blooded; that he did not notice his aunt breathing at all. Being allowed, notwithstanding his interest in the event, to testify as to occurrences in the presence of his uncle's person, at a time when, according to the testimony of both Miss Wigley and himself, his uncle was unconscious, Mr. J. Remsen Bennett says that he went to the side of his aunt, while his uncle was upon the floor, got smelling salts and a bottle of whisky, which were alongside his aunt, and went back to his uncle; that at that time his uncle was breathing heavily; that he (the witness) worked his uncle's arms for nearly 10 minutes; that, after the witness had ceased working, his uncle was lying across witness' knees, and the witness was on the floor; that there was a time when he left his uncle's body off his knees on the floor, and at that time the heavy breathing had ceased; that 10 minutes later the physician arrived and commenced working with his uncle's body; that the physician loosened his collar, and apparently felt of the heart, lifted his head with the assistance of the witness; and that then the body was placed on the floor. Mr. J. Remsen Bennett says that, on placing the body on the floor, he noticed a sinking of the body, a relaxation of the body, as it was laid down.

Dr. Ager testifies that, at about 20 minutes after 11, upon his arrival, he saw Mrs. Bennett's body first (before he saw the body of Mr. Bennett); that at that time he went no nearer to her than 18 to 20 feet; that she was evidently dead; that her color had changed, and she had the customary appearance of a corpse; that her eyes were partly open and partly shut; that the simple sight of her corpse was sufficient to show him she was dead; that he turned and saw Mr. Bennett lying upon the floor, a few feet from Mr. J. Remsen Bennett; that Mr. Adolphus Bennett's color was good, his natural color; that it (the natural color) had not left his face at all; that he could not find that his heart was beating; that he was unable to determine whether or not he was breathing; and that his appearance was that of a faint. After describing his endeavors to resuscitate Mr. Bennett, the physician says:

"Then the change came, and the color went out of his face, and he had then the same appearance that Mrs. Bennett had when I came in. The color left his face thoroughly. His eyes were half open as they are in a corpse."

The doctor then noticed the appearance of the wife's person, and says with detail that the condition then observed indicated that death had taken place some time previous.

It would not be profitable to trace all the processes by which the conclusion has been reached, not only that Mrs. Bennett did not live longer than her husband, but that she died before his death.

There is no need for expressing any doubt whatever of the sincerity of Miss Wigley's testimony; but there are defects and infirmities in her recital which would impair her credibility, even if there were not

opposing evidence. She makes it certain that after she left Mrs. Bennett's person she did not return, and that, from that time, though she remained, no care was given to Mrs. Bennett by her or any other person, until the physician, about 20 minutes later, pronounced her dead. In this interval, Miss Wigley was without employment, except that she telephoned to two persons. If this disregard on her part was the result of a disturbance of her faculties, which might well have followed the horror and grief of the occasion, we might respect the loss of her reason; but we would follow in her senseless steps if we should accept her testimony as to events of nice and almost imperceptible gradation which are said to have occurred while she was deprived of the powers of calm observation.

Whether Mrs. Bennett was breathing, whether her pulse was beating, and whether her face was natural in color and form, are questions too close and delicate for the arbitrament of a witness who was so bereft of rational impulses as to forget her mistress and friend at a time when, according to her testimony, she believed her to be still within the zone of resuscitation. But the greater significance of the maid's conduct is that, however shocked or disabled, a woman who had just left the side of one whom she loved would return if she believed her friend and benefactress to be still alive. The intuitions of womanhood, too vital and persistent to be obliterated even by grief or terror, seem to constrain the conviction that, in desisting wholly from any endeavor in behalf of her mistress for more than 20 minutes, the maid gives the highest assurance that life had left her mistress before she herself had left her.

Miss Wigley's testimony is impaired by the zeal, if not the irresponsibility, with which she presumes to affirm matters both of fact and inference which would indicate that Mr. Bennett died upon his feet at the instant of his attack. Her extreme fidelity to the theory which she is called to support is seen in the statement that Mrs. Bennett's face was perfectly natural and showed nothing the matter with it. This is scarcely conceivable under the circumstances shown, whether the lady was already dead or was within 20 minutes of actual death. Her evidence as to Mrs. Bennett's appearance is opposed by Mr. J. Remsen Bennett and Dr. Ager, and is rejected.

There is testimony that, as to whether Mrs. Bennett was dead before Mr. Bennett was stricken, Miss Wigley's declaration before the trial was irreconcilable with her testimony. Her examination, as to whether she had talked before the trial about the occurrences detailed in her testimony, compels the conviction either that her testimony was in this respect, and, therefore, in others, untruthful, or, as it is kinder to believe, that she has not a sober appreciation of the value of words used by her under oath.

In a case where trifles light as air are confirmation, it has seemed well to recall the blemishes inherent in this witness' testimony, for they justify the mind in preferring the testimony of Mr. J. Remsen Bennett and Dr. Ager, although one is an interested witness and the other, largely through his own temperance and restraint, falls short of demonstrative proof.

The decree must provide for the disposition of the estate accounted for in accordance with the laws which govern in cases of intestacy.

Decreed accordingly.