In re MILLER.

(Supreme Court, Appellate Division, First Department.   February 16, 1912.)

1. CHARITIES (§ 7*)—BENEFICIARY—CAPACITY.
    A legacy to a theological institution in France in trust to provide free
    scholarships under a will executed in 1886 by one who died in 1907 con-
    stituted a valid trust for a charitable use, and did not lapse on adop-
    tion in 1905 of the French separation law, which separated the institu-
    tion from the French government as a public institution; it having con-
    tinued to exist under the law as a religious association for the old pur-
    poses.
    [Ed. Note.—For other cases, see Charities, Cent. Dig. § 17;   Dec. Dig.
    § 7.*]

2. TRUSTS (§ 160*)—VALIDITY—FAILURE TO SPECIFY TRUSTEE.
    A trust will not fail for want of a trustee.
    [Ed. Note.—For other cases, see Trusts, Cent. Dig. § 204;   Dec. Dig. §
    160.*]

    Laughlin, J., dissenting.

Appeal from Surrogate's Court, New York County.

In the matter of the judicial settlement of the accounts of George
MacCulloch Miller, Louise H. Leclere's executor.   On appeal from a
decree adjudging that a legacy had lapsed.   Reversed and decree di-
rected.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE,
SCOTT, and MILLER, JJ.

J. S. & H. A. Wise (John S. Wise, Jr., of counsel), for appellants.
Coudert Bros. (Frederic R. Coudert, of counsel), for respondent.

CLARKE, J.   Appeal from a decision of the surrogate in a pro-
ceeding for an accounting, holding that a legacy had lapsed and had
gone into the residuary estate.   Louise Leclere executed her last will
and testament on July 9, 1886.   She died in the city of New York,
of which she was a resident, on February 24, 1907, and her will was
admitted to probate June 10, 1907.   She appears to have left no rela-
tives.

The question here grows out of the following clause of the will:

"I give and bequeath to the Faculté de Théologie Protestante de Montau-
ban, in France, one hundred thousand francs, of the currency of France, to
be held in trust, to invest and keep the same invested and drawing inter-
est and to apply the interest and income therefrom yearly and every year,
to as many free scholarships, under the control of said Faculté as said
yearly interest will pay for or allow.   Such scholarships to be granted, first,
to the sons of poor clergymen in France intending to become ministers of
the gospel, as may desire the same, and, secondly, in the absence of such
to any poor young men wishing to become ministers of the gospel or mis-
sionaries.   It is my desire that this fund or endowment may bear my mother's
name, and be known and designated as the 'Fonds Guinaud' and to her memo-
ry I institute and dedicate the same."

She directed her executors to divide all the rest and residue of her
property and estate into two shares, one of which she gave to the
French Evangelical Church in the city of New York, and the re-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

maining half to the Société Protestante pour l'Encouragement de l'Instruction Primaire en France to be used forever by such society to increase the salaries of deserving teachers in the discretion of said Société. On December 9, 1905, 14 months prior to the death of testatrix, the separation law was passed by the French Legislature and promulgated on December 11th by the President of the Republic. The said law provides:

"Article 1. The Republic assures the liberty of conscience. She guarantees the free exercise of religious bodies under the sole restrictions hereinafter provided in the interest of public policy.

"2. The Republic does not recognize nor pay, nor subvention any cult. Consequently, on and after the first of January, following the promulgation of the present law, shall be suppressed from the state budget and from the budgets of the departments and communes all provisions relating to the exercise of cults. * * * .Public establishments of worship are suppressed under reserve of the provisions contained in article 3.

"3. The establishments, the suppression of which is ordered by article 2 shall continue to function provisionally in conformity with the provisions which now govern them until the attribution of their assets to such associations as are provided for by title 4, and at the latest until the expiration of the delay hereinafter indicated. * * *

"4. Within one year from the promulgation of the present law, the personal and real property of the 'meaces,' 'fabriques,' 'conseil presbyeraux,' 'consistories,' and other public cultual establishments shall be with all their liens and incumbrances and with their special affectation transferred by the legal representatives of said establishments to the associations which, in conforming with the general organization rules .of the cult the exercise of which they propose to assume, shall have been legally formed according to the provisions of article 19, in regard to the exercise of said cult in the former circumscription of said establishment. * * *

"18. Associations formed for the purpose of providing for the expenses, maintenance and public exercise of a religion must be constituted in conformity with article 5 and the following articles of title 1 of the law of July 1, 1901. Furthermore, they shall be subject to the provisions of the present law.

"19. * * * The associations shall be able to receive, besides the subscriptions provided for by article 6 of the act of July 1, 1901, the proceeds from the collections for the expenses of the cult, and to receive remuneration for the ceremonies and religious services even by foundation; for the hiring of pews and seats; for the supply of things destined to funeral services in religious buildings and the decoration of such buildings. They shall be able to pay, without giving rise to a fiscal tax, the surplus of their receipts to other associations constituted with the same object. They shall not be able to receive, under whatever form it may be, subventious from the state, the departments and communes. * * *

"20. Such associations may, within the forms provided for by article 7 of the decree of August 16, 1901, constitute unions having a central administration and management. Such unions shall be governed by article 18 and by the last five paragraphs of article 19 of the present law."

"22. Associations and unions .may employ their available resources for the creation of a general reserve fund sufficient to assure the expenses and maintenance of religion, but said fund cannot in any case receive any other destination; the amount of such general reserve can never receive a sum which shall be equal, for the unions and associations having more than 5,000 francs of income, to three times and, for other associations, to six times the average sum usually disbursed by each of them for the expenses of worship during the last preceding five years of its existence. Besides this general reserve fund, which must be invested in nominative securities, they may create a special reserve fund which must be deposited in money or in nominative securities with the 'Caisse des Dépôts et Consignations' (Government Deposit Bank) to be exclusively used, as well as the interests thereof. to the pur-

chase, constructions, decoration or repairs of buildings or fixtures destined for the needs of the association or union."

The Faculté de Theologie Protestante de Montauban is a superior school for the teaching of theology. Its purpose is to educate Protestant ministers of the gospel. It originated in the sixteenth century. From 1598 to 1659 it existed under the name of "L'Academie Protestante de Montauban." It was transported to Puylaurens in 1659, and there existed until 1685, when it was returned to Montauban. Under the Concordat entered into between Pius VII and the First Consul, July 15, 1801, and by decrees of 1808 and December 8, 1809, it was reconstituted by the French government. Since that decree it has been considered by the French jurisprudence as a public institution, and it was supported by appropriations of funds from the budgets of the French government.

As appears from the testimony of the French attorney at law:

"Before the law of December 9, 1905, the faculty of Montauban was a public institution and a moral person. That is to say, it had legal identity like a natural person, and therefore it had the capacity of acquiring property for a consideration or gratuitously, by gift or legacy. It could act in justice and acquire property just the same as an individual person. Therefore I think it corresponded to an American incorporated association. Its character was religious; its business the teaching of theology; its purpose the training of its students for the profession of Protestant ministers of the gospel."

As such public institution it not only received government moneys, but its faculty and officers were appointed by the state. With all the other religious bodies which had since the Concordat been so constituted and in receipt of public moneys, it was "suppressed" by the law of December 9, 1905, as a public institution, and therefore separated from the French government; that is, it ceased to receive public moneys, and the state authorities ceased to appoint its faulty and other officers. While it thus lost its official public character, it still exists in fact as a free faculty. The said law did not demolish said Faculty and a decree of the President of the Republic of June, 1907, acknowledged its existence de facto since it attributed its property to the Unione Nationale. There has been no interruption in its existence. It has pay students and scholarship students exactly as before the separation act; its course of instruction is the same, and it has the same professors. It is located in the same place, has the same rooms, library, and furniture. It remains identically the same organization as before the act, with the exception that it has lost its public character.

This Faculty accepted the law of 1905, and an association or union was formed under the law—the National Union of the Evangelical Reformed Churches of France. The French expert testified:

"It was not the intention of the law of December, 1905, to render impossible religious worship and the recruiting ministers of the gospel. Therefore, in title 4 it permitted the organization of cultual associations which were to take the place of the public establishments that were to disappear. The Unione Nationale des Églises Reformées Évangéliques de France is a union of cultual associations formed to administer Protestant religion in France. The organization of such unions was permitted in article 20 of the law of December 9, 1905. It originated in 1906 by the union or amalgamation of

several unions or cultual associations. After being duly declared it has a judicial capacity; that is to say, the capacity of suing and being sued, but its capacity of acquiring property is limited by article 33 and the following articles of the decree of March 16, 1906."

By the decree it was provided:

"Article I. There are attributed to the National Union of the Evangelical Reformed Churches of France with its special destination the personal property hereinafter designated which has belonged to the Faculty of Protestant Theology of Montauban suppressed from November 1, 1906, in execution of the laws of December 9, 1905, and July 20, 1906, and to the seminary connected with the said Faculty, to wit: 1. The funds in hand and the sums deposited at the treasury. 2. The sums deposited at the Government Deposit Bank, and especially those coming from the Aurillon legacy (decree May 23, 1883). 3. A certificate (nominative) of government stock 3%, Series 5, No. 538,267, amounting to Frs. 310 (bequest of Marie Dupuy, wife of Guedon, and bequest of Paul Guedon). 4. The collections and laboratory instruments, books, household furniture and other personal objects being in the premises occupied at the date of October 31, 1906, by the Faculty of Theology and the seminary connected therewith, excepting the books and personal objects which shall be, after inventory, recognized as belonging to the library of the University of Toulouse (Theological Department).

"Art. II. The sums proceeding from the Aurillon bequest shall remain deposited at the Government Bank of Deposits. The loans to students, to which said bequest is destined shall be made in conformity with the clauses of the testament and in the conditions provided for by special regulations made by the National Union of the Evangelical Reformed Churches of France."

The learned surrogate has held that:

"The legatee named by the testatrix had, therefore, no capacity to take title to the legacy at the time of her death. Considered as a bequest in trust for the class of persons mentioned by the testatrix, to wit, poor young men, preferably ministers' sons, desiring to become ministers of the gospel, for whose education the income of the fund was designed by her to support scholarships under the control of the Faculty named in her will, it does not appear from any provision of French law submitted in evidence that the claimant has power to receive it as trustee for that purpose."

And, referring to the Unione Nationale des Églises Reformées Évangéliques de France, he said:

"There is no power given to the claimant, either by the said decree or by the separation act, so far as their provisions are in evidence, to take property by foundation—that is to say, by way of trust or other provision of a continuing nature—except that contained in article 33, which limits such foundations strictly to remuneration for ceremonies and religious services"

—and hence determined that the legacy must be distributed as part of the residuary estate.

The testatrix had been domiciled in this state, and, her personal property attempted to be disposed of by her will being located here, all questions relating thereto are primarily to be governed by the laws of this state. There can be no doubt but that she intended to create a trust for a perfectly proper and legal charitable use, the income of the fund to be used for free scholarships for the education by the Faculté de Théologie Protestante of Protestant ministers of the gospel. Such purpose has been recognized as a charitable use from the earliest times.

Chapter 701 of the Laws of 1893, as amended by chapter 291, Laws of 1901 (now Personal Property Law, § 12 [chapter 41, Consol. Laws

1909; chapter 45, Laws 1909]; Real Property Law, § 113 [chapter 50, Consol. Laws 1909; chapter 52, Laws 1909]), provides as follows:

"Section 1. No gift, grant, bequest or devise to religious, educational, charitable, or benevolent uses, which shall, in other respects be valid under the laws of this state, shall or be deemed invalid by reason of the indefiniteness or uncertainty of the persons designated as the beneficiaries thereunder in the instrument creating the same. If in the instrument creating such a gift, grant, bequest or devise there is a trustee named to execute the same, the legal title to the lands or property given, granted, devised or bequeathed for such purposes shall vest in such trustee. If no person be named as trustee then the title to such lands or property shall vest in the Supreme Court.

"Sec. 2. The Supreme Court shall have control over gifts, grants, bequests and devises in all cases provided for by section 1 of this act. * * * The Attorney General shall represent the beneficiaries in all such cases, and it shall be his duty to enforce such trusts by proper proceedings in the court."

Being a valid trust for a charitable use, it is claimed, and the surrogate has held, that it must fail solely because of a want of capacity to take under the French law. Assuming that the surrogate was right, that neither the Faculté nor the Union had the capacity to take, we have the situation presented of a valid trust for a charitable use where no trustee was named by the testatrix, or where the trustee named is incapable of acting. It is a familiar rule of equity that no trust shall fail for want of a trustee. In Allen v. Stevens, 161 N. Y. 122, 55 N. E. 568, Chief Judge Parker said:

"As this statute is remedial in its character, it should be liberally construed with a view to the beneficial end proposed. * * * Under the provisions of the act, a testator may name a corporation as trustee, or provide that a corporation to be formed shall act as trustee, or the trustee named may be an individual; but, if he name none of these, the statute provides, in effect, that the trust shall not fail, but the title to the property devised or bequeathed in trust shall vest in the Supreme Court, which shall have control over gifts, grants, bequests, and devises provided for by the act."

In Matter of Griffin, 167 N. Y. 71; 81, 60 N. E. 284, at page 287, Judge Gray said:

"In naming as trustee a corporation incapable of acting as such, the case is the same as if no trustee had been named in the will, and under the provisions of the act, in such event, the property vested in the Supreme Court, which is charged with the duty of administering the trust for the benefit of the beneficiary. To hold otherwise would be to narrow the construction of the act of 1893, and to deny to it that practical effect, which will make it operative to save gifts to religious, charitable, educational, and benevolent uses. As was formerly the rule in equity, so, with this statute in force, a trust shall never fail for want of a trustee to execute it."

In Bowman v. Domestic and Foreign Missionary Society, 182 N. Y. 494, 75 N. E. 535, the will provided as follows:

"I give, devise and bequeath the sum of two thousand dollars to be equally divided between the Indian missions and domestic missions of the United States in memoriam of the late Mary A. Archer."

Werner, J., said:

"The respondent, the Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States of America, was duly incorporated under the laws of this state, having for its purpose the general conduct of missionary operations in all lands. This society claims to be entitled to the bequest. * * * We think the trial court correctly held that the clause in question, even when read in connection with evidence adduced

at the trial, was too indefinite to be construed as a direct bequest either to the defendant or to any other beneficiary. But we are also of the opinion that the bequest did not fall, and that it can be supported as a trust for charitable purposes under the provisions of chapter 701 of the Laws of 1893, as amended by chapter 291 of the Laws of 1901. * * * The effect of this statute, as demonstrated in the case of Allen v. Stevens, 161 N. Y. 122, 55 N. E. 568, was to restore the ancient doctrine of charitable uses and trusts as a part of the law of this state, and the statute was designed to cover just such a case as the one at bar. The obvious purpose of the testatrix was to have this fund distributed for the benefit of domestic and Indian missions. She was a regular member, attendant, and communicant of the Protestant Episcopal Church, and actively engaged in the charitable work carried on through its instrumentality. The defendant is the organized medium through which the Protestant Episcopal Church of America carries on its missionary operations, which include work in the western states and territories among the Indians, negroes, and white people, and in the prosecution of which large sums are disbursed every year. The ninth clause, supplemented by the evidence, sufficiently indicates the charitable purpose to which the testatrix desired to apply her bequest to enable the Supreme Court, under the power derived from the statute, to administer this as a trust in which the beneficiary or trustee is not named or designated with absolute certainty or correctness. This it can do through the instrumentality of a trustee appointed by it. If that course is deemed wise, the court will doubtless be influenced in the choice of a trustee by the nature of the charity to be administered, and may appoint the defendant as the medium best adapted to accomplish the end sought." Mount v. Tuttle, 183 N. Y. 358, 76 N. E. 873, 2 L. R. A. (N. S.) 428.

The will gave, devised, and bequeathed unto Rev. Daniel S. Tuttle, Bishop of Utah, the Protestant Episcopal Missionary Bishop of Utah and Idaho, in his corporate capacity, and to his successor or successors in office, the sum of $20,000—

"in trust, nevertheless, to erect therewith, at such place within the limits of his Episcopal jurisdiction, as he, his successor or successors, shall select, a Protestant Episcopal Church building to God's glory, and the further sum of five thousand dollars, in trust, nevertheless, to erect therewith in the same place, a rectory for the rector or clergyman in charge of said church, to be the property of the aforesaid Protestant Episcopal jurisdiction."

Chief Judge Cullen said:

"At the time of the testatrix's death there was no such corporation as the Protestant Episcopal jurisdiction or church of Utah and Idaho, nor has any such corporation since been created. The trial court found as matters of fact that said gifts were void and invalid under the laws of Utah and of Idaho, and awarded the fund to the next of kin of the testatrix. * * * The principal discussion in the learned Appellate Division seems to have turned on the question how far our recent statute regulating gifts for charitable purposes (Laws 1893, c. 701) has extraterritorial effect. We will assume that were the gift to be administered within this state its validity would be upheld under the statute cited. Allen v. Stevens, 161 N. Y. 122 [55 N. E. 568]. The majority of the Appellate Division held that the validity of the trust or gift was to be determined by the laws of Utah and Idaho, not by those of this state. The learned judge who wrote for the minority of the court was of opinion that, as the trust was valid under the laws of this state, the trustees could be compelled to designate beneficiaries, who, being then made certain instead of, as before, indefinite, could secure an enforcement of the trust in the courts of any state, and thus the administration of the trust be independent of the laws of that state. * * * We are of opinion that the validity of a gift or trust under such circumstances depends on the extent to which it is necessary that the administration should be had in the foreign jurisdiction. For example, we do not at present see why a legacy given by a citizen of this state even to a foreign trustee in

trust to distribute the principal or the annual income among the poor clergymen in a foreign state could not be upheld, though such a trust was invalid by the laws of that state. The laws of a state on the subject of trusts are intended to regulate the tenure of property therein. Hope v. Brewer, 136 N. Y. 138, 32 N. E. 558, 18 L. R. A. 458. We imagine that in no jurisdiction are human beings of age and of sound mind incompetent to receive money or personal property. Therefore, in the case suggested, there would seem no difficulty despite the nonresidence of the trustee in retaining the fund here where the tenure would be legal and in remitting the money as it might become payable to the foreign beneficiaries."

This expression of the views of the Court of Appeals exactly applies to this case. In Matter of Robinson, 203 N. Y. 380, 96 N. E. 925, the testatrix gave the residue of her estate to two persons named, in trust, however, for the following uses and purposes, to wit: To provide shelter, necessaries of life, education, general or specific, and such other financial aid as may seem to them fitting and proper to such persons as they shall select as being in need of the same. Preference is to be given to persons who are elderly or disabled from work, and to persons who are Christians, of good moral character, members of one of the so-called Evangelical Churches, to wit, the Methodist, Baptist, Presbyterian, Congregational, Moravian, or Episcopal, and who are not addicted to the use of intoxicants or tobacco nor to attendance at theatrical entertainments. Chase, J., said:

"Gifts for religious, educational, charitable, or benevolent uses, to indefinite or uncertain beneficiaries, are now permitted in this state by express provisions of statute. * * * The law relating to gifts for charitable uses as it existed prior to chapter 701 of the Laws of 1893, which was substantially re-enacted in said personal property law and said real property law, has been changed. * * * The spirit of love and religion which is the basis of charity should be exercised in construing the provisions of such acts. A will, however, must sufficiently define the beneficiaries and the purpose of the testator so that the trust can be enforced by the courts, otherwise the will does not come within the provisions of the acts. The gifts must be also for a public, and not a private, purpose. * * * It being determined from the will that the trust and the purpose of the testatrix in her attempt to establish it are for the uses enumerated in the statute, the courts can and will, at the suit of the Attorney General of the state, compel the trustees to carry out the same according to such purpose and for such uses. Trusts otherwise valid under the acts mentioned are sustained, although the beneficiaries are not necessarily or in terms confined to residents of this state"— citing cases, including Manley v. Fiske, 139 App. Div. 665, 124 N. Y. Supp. 149, affirmed 201 N. Y. 546, 95 N. E. 1133.

In the latter case, opinion by Mr. Justice Miller, an American citizen domiciled in England left personal property in England and the state of New York. He disposed of his property in New York by what is termed the "American will." The provisions of the will were as follows:

"After the above legacies are paid without unnecessary delay, the sum remaining I desire my executors to divide the surplus among such American charities they may think well of, and I would like these sums to be given to any society that assist poor needle-women (seamstresses) whose toil is so poorly requited. If no such organization exists the money to be divided for the benefit of incapacitated sailors and their families."

The opinion says:

"The appellants contend that no trust was created or intended, and that the bequest is void for indefiniteness. There can be no doubt that the be-

quest would be void but for chapter 701 of the Laws of 1893, as amended by chapter 291 of the Laws of 1901. The appellants contend that the purpose as well as the beneficiaries of the gift are indefinite, and that the statute only saved gifts which would otherwise have been void for indefiniteness of beneficiary. * * * The primary purpose of the bequest was, then, to assist poor needlewomen. The beneficiaries alone are indefinite, and the case comes directly within the statute. It is next contended, however, that the statute was intended only to save trusts for charitable uses, and that no trust was created. It is true that there are no express words creating a trust, as there are no express words of gifts; but it is quite plain that a trust was intended. A trust is almost inseparably involved with a gift for charitable uses, and the statute provides for the case of a failure to select a trustee as well as for the case of indefiniteness of beneficiary. In case no trustee is named the title vests in the Supreme Court."

Applying the principle of the foregoing cases, it seems to me that it is our duty to declare that this legacy has not lapsed, but that it is the duty of the Supreme Court to undertake the execution of the trust for the charitable uses created by the testatrix. As said by Chief Justice Cullen, in Mount v. Tuttle, supra:

"We imagine that in no jurisdiction are human beings of age and of sound mind incompetent to receive money or personal property. Therefore, in the case suggested there would seem no difficulty, despite the nonresidence of the trustee, in retaining the fund here where the tenure would be legal and in remitting the money as it might become payable to the foreign beneficiaries."

As the Faculté de Théologie continues to exist as a de facto school of theology, and as it is entitled to receive payment for its teachings and as it has pay and scholarship students, it would seem that there would be no difficulty whatever in transmitting the income of the trust fund here retained to accomplish the beneficent and charitable purpose of the testatrix. So much of the decree of the surrogate as adjudges that the legacy has lapsed and should be distributed to the residuary legatees should be reversed, and it should be decreed that a valid trust for a charitable use was created by the will, and that the legal title to such trust estate has vested in the Supreme Court, and it is charged with the duty of executing the same.

Final judgment to be settled on notice to all parties, including the Attorney General, which should contain the provisions to enforce such trust as is provided in section 12 of the personal property law, with costs to all parties appearing and filing briefs in this court on the appeal to be paid out of the fund.

INGRAHAM, P. J., and SCOTT and MILLER, JJ., concur.

LAUGHLIN, J. (dissenting). On the 24th day of February, 1907, Louise H. Leclere died leaving a last will and testament, which was duly admitted to probate by the Surrogate's Court of the county of New York on the 10th day of June, 1907, and letters testamentary were duly issued thereunder. The eleventh clause or paragraph of her will has been adjudged, by the decree from which the appeal is taken, to be invalid, and the legacy thereby given has been directed to be distributed as part of the residuary estate. The provisions of the will which have been declared void are as follows:

"I give and bequeath to the Faculté de Théologie Protestante de Montauban, in France, one hundred thousand francs, of the currency of France, to be held in trust, to invest and keep the same invested and drawing interest and to apply the interest and income therefrom yearly and every year, to as many free scholarships, under the control of said Faculté as said yearly interest will pay for or allow. Such scholarships to be granted, first, to the sons of poor clergymen in France intending to become ministers of the gospel, as may desire the same, and secondly, in the absence of such to any poor young men wishing to become ministers of the gospel or missionaries. It is my desire that this fund or endowment may bear my mother's name, and be known and designated as the 'Fonds Guinaud' and to her memory I institute and dedicate the same."

The testatrix was a native of Paris, France, but at the time of making the will, on the 9th day of July, 1886, and of her death, she was domiciled in New York. When she made the will, the Faculté de Théologie Protestante de Montauban was "a public establishment and had a legal entity," could take property "by gift or legacy" and hold and administer the same, and could sue and be sued. It occupied under the laws of France a position similar to that occupied by corporations in this country. It and its predecessor had existed since 1598, and it was reconstituted by a decree of the French government on the 8th day of December, 1809. It was supported in part by appropriations of public funds. It was a religious institution engaged in teaching theology and training "students for the profession of Protestant ministers of the gospel." It was suppressed as a public institution or establishment by a statute, known as the "Separation Act," which took effect on the 9th day of December, 1905. That statute authorized the "attribution" of the property of the institutions, suppressed as public institutions, to "cultual associations," to be organized under a governmental decree, which was made on the 16th day of March, 1906. Although suppressed as a public institution or establishment, it appears by expert testimony with respect to the French law that it still exists de facto, and is carrying on the same work by the same professors, with the exception of three who have retired, and at the same place and in substantially the same manner, and that it is enabled to do so by funds received from the Unione Nationale des Églises Reformées Évangélique de France, a union of cultual associations created pursuant to the provisions of the separation act on the 2d day of February, 1906, for the administration of Protestant religion in France, to which the property of the Faculté de Théologie Protestante de Montauban, and that of all other Protestant religious organizations, orders, and institutions in France was "attributed" or transferred and turned over as authorized by the separation act. Such transfer from this legatee included two special "foundations" or endowments. There is also evidence to the effect that the legatee continues to receive pay students and to maintain free scholarships as well. The scheme of the separation act was to have the property of the suppressed organizations, institutions, and orders transferred to a corporate entity to be created by a decree of the President of the Republic of France, to be administered by it for the purposes for which the property had been received and was held, but, in effect, under government supervision and with restrictions, in the in-

terest of the public policy of France as shown by the statute and decrees thereunder, by which the amount of property to be received and held for such purposes was limited. The evidence shows that the legatee was without authority to receive this legacy at the time of the death of the testatrix.

This was a bequest to a foreign corporate entity on condition, or in a limited sense, in trust, to hold the corpus in perpetuity and to apply the income to a particular purpose, which was one of the principal functions performed by the legatee; but there was no trust in the strict sense in which that term is used with respect to the title to or ownership of property, and therefore this legacy did not contravene our statutes with respect to perpetuities and accumulations of income. Williams v. Williams, 8 N. Y. 525; Wetmore v. Parker, 52 N. Y. 450–459; Fosdick et al. v. Hempstead et al., 125 N. Y. 581–595, 26 N. E. 801, 11 L. R. A. 715; Matter of Griffin, 167 N. Y. 71, 60 N. E. 284; First Presbyterian Church v. Mackallor, 35 App. Div. 98, 54 N. Y. Supp. 740. The validity of a bequest for a charitable use to a foreign corporation to be administered abroad depends upon the foreign law, but is to be determined by the courts of the domicile of the testator. Robb v. Washington & Jefferson College, 103 App. Div. 327, 93 N. Y. Supp. 92, affirmed on this point 185 N. Y. 485, 78 N. E. 359; St. John v. Andrews Institute, 117 App. Div. 698, 714, 102 N. Y. Supp. 808; Matter of Huss, 126 N. Y. 537, 27 N. E. 784, 12 L. R. A. 620; Matter of Sturgis, 164 N. Y. 485, 58 N. E. 646. There was here no gift in trust save in the sense that every gift to a charitable use in perpetuity involves a trust relationship, and is subject to supervision by the law and courts of the jurisdiction in which it is to be administered, and the gift was direct without the intervention of a trustee. Catt v. Catt, 118 App. Div. 742, 750, 103 N. Y. Supp. 740; Matter of Griffin, supra; Bird v. Merklee, 144 N. Y. 544, 39 N. E. 645, 27 L. R. A. 423; Wetmore v. Parker, supra; St. John v. Andrews Institute, supra. I am of opinion that chapter 701 of the Laws of 1893, as amended by chapter 291 of the Laws of 1901, has no application to the case at bar. Those statutory provisions literally apply only to bequests and devises of property for charitable uses otherwise valid under the laws of New York, but theretofore void or incapable of enforcement for want of a trustee, or uncertainty, or indefiniteness with respect to the beneficiaries, and, in so far as they relate to trusts, their operation does not extend to a bequest for a charitable use to be administered in a foreign jurisdiction. In Allen v. Stevens, 161 N. Y. 122, 55 N. E. 568, the statute received a very liberal construction, and it was held that it restored the doctrine of charitable uses and trusts in effect as declared in Williams v. Williams, supra, by which a trust does not fail for want of a competent trustee or for indefiniteness or uncertainty with respect to the beneficiaries, and that it was no longer essential to the validity of a trust for a charitable use in perpetuity that it be to a corporation existing or to be created within two lives in being; but that decision has no bearing on the question presented for decision. I do not agree with the view that this bequest is subject to the construction that it involves an express trust for a definite beneficiary which is capable of admin-

istration by a trustee other than the legatee, the income to be paid to the legatee, which has been suppressed as a public establishment or institution.

I am also of opinion that, if this bequest were construed as an attempt to make a bequest or an express trust, it could not be sustained. In that view the legatee would be both trustee and beneficiary, and under the well-settled rule the trust would merge. . Robb v. Washington & Jefferson College, supra. In a sense, of course, the students selected for the free scholarships would be beneficiaries, but the testatrix did not contemplate that they should receive the income, although she attempted to provide that they should be benefited thereby. The vulnerable point in such a theory of construction is that the trust, whether it be regarded strictly as an express trust, or in the broad sense that every bequest to a charitable use in perpetuity involves a trust relationship, is that the trust or trust relationship does not end with the investment of the funds and collections of income, for it is not contemplated that the income shall be paid over to certain students selected by the legatee or otherwise to be used by them in educating themselves for the profession of Protestant ministers, but it continues with respect to the application of the income to accomplish the purposes intended by the testatrix, and this was to be done, not by distributing the income to individuals, but by using it in defraying the expenses of educating them for the Protestant ministry. The principal and vital part, therefore, of the trust, considered in any aspect, required the administration of the income in France, and by the legatee for the particular purpose expressed in the will. In so far as the trust is to be administered in France, it is quite clear that chapter 701 of the Laws of 1893, as amended, affords no authority for the courts of this state to act as trustee, and they have no inherent or other authority to administer a trust in a foreign state or country. Catt v. Catt, supra.

It is manifest that there could be no supervision by our courts, and it does not appear that there could or would be any by the courts of France over the use of the income if paid over to it as proposed by the majority opinion. The title and beneficial use are here given to the legatee. The legatee having no authority to take this legacy at the time of the death of the testatrix, the bequest was void (Owens v. Missionary Society of M. E. Church, 14 N. Y. 380, 67 Am. Dec. 160; approved in Mount v. Tuttle, 183 N. Y. 367, 76 N. E. 873, 2 L. R. A. [N. S.] 428; St. John v. Andrews Institute, supra; White v. Howard, 46 N. Y. 144; Murray v. Miller, No. 1, 85 App. Div. 414, 83 N. Y. Supp. 591, affirmed 178 N. Y. 316, 70 N. E. 870), and it lapsed and became part of the residuary estate (Carter v. Board of Education, 144 N. Y. 621, 39 N. E. 628; Holland v. Alcock, 108 N. Y. 312, 16 N. E. 305, 2 Am. St. Rep. 420).

I am of opinion, therefore, that the decree was right, and should be affirmed.